# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## BILLINGS DIVISION

| | |
|---|---|
| SCOTTRADE, INC. an Arizona, Corporation,<br><br>   Plaintiff,<br><br>vs.<br><br>KRISTINE DAVENPORT, individually, SHANE M. LEFEBER, individually, CHRISTOPHER GIBBONS, individually, KIMBERLY CHABOT, individually, PATRICIA FALLER, individually,<br><br>   Defendants. | Case No. CV-11-3-BLG-RFC<br><br><br><br>ORDER RE:<br>MOTIONS FOR SUMMARY<br>JUDGMENT |

## I. INTRODUCTION

Scottrade, Inc., an online brokerage firm, filed this interpleader action in early 2011 to resolve ownership of the account of a deceased account holder, James LeFeber ("Jim" or "LeFeber"). Although LeFeber executed a Transfer on Death Beneficiary Plan ("TOD Plan") a month before his death directing how his Scottrade account should be distributed, one of his beneficiaries, Defendant

Kristine Davenport, a former girlfriend, claims entitlement to the entire account. The four other beneficiaries do not contest the TOD Plan. When Davenport refused to release Scottrade from liability if it distributed the proceeds pursuant to Jim's TOD Plan, Scottrade filed this action and placed the proceeds of the account in the Court registry pending resolution of Davenport's claims. Named as defendants were all five beneficiaries named in the TOD Plan.[1]

Once the proceeds of the Scottrade account were placed in the Court registry, Scottrade was dismissed from the case. *Doc. 42.* Since Scottrade acted prudently in filing this suit and placing the money in the Court registry, the Court ordered that Scottrade recoup its attorney fees from the proceeds held by the Court. *Id.* In doing so, the Court expressly reserved ruling as to whom the approximately $6,000 in attorney fees would be charged. *Id.*

Defendant Shane LeFeber ("Shane") is the son of Jim's longtime girlfriend Maggie Johnson, who was with Jim from the 1980's until she left him in 2005 or 2006. LeFeber and Johnson moved to Florence, Montana together in 1994. Johnson and LeFeber were involved in litigation over the house in Florence until 2007. Jim and Shane were close and remained so after the relationship ended,

---

[1]When the term "Defendants" is used in this Order it refers to the beneficiaries who are adversaries to Kristine Davenport: Shane Lefeber, Patricia Faller, Christopher Gibbons, and Kimberly Chabot. Davenport will be separately identified.

with Shane siding with Jim over his mother. Jim considered Shane his step-son and left him his residuary estate, his oil and gas leases, and 56% of the Scottrade account. Shane spent considerable time away from his family in Bend, Oregon to care for Jim in Montana over the last months of his life.

Defendant Patricia Faller was LeFeber's neighbor in Florence since he moved to the Bitterroot Valley in 1994. Over the years, and especially after Maggie left, Jim had holiday meals with Faller and her husband Arnold. As soon as Jim learned he was ill, he immediately designated Faller as his attorney-in-fact. She was designated in his will as the personal representative of his estate and was given his home and his beloved dog and cat. Under the TOD Plan, she is entitled to 4% of the Scottrade account. Faller has retained counsel for this lawsuit.

Christopher Gibbons met Jim LeFeber in 1979, when Jim moved across the road from Gibbons and his parents in Idaho. Jim was a father figure to Gibbons, helping him and his brothers through some difficult family times in their teenage years. Gibbons avers that Jim's compassion and love made an enormous difference in his life. Jim asked that Gibbons be there when he died and Gibbons complied, taking time away from his family and work in Idaho to take care of Jim during his last two months. Jim left 16% of his Scottrade account to Gibbons. Gibbons is proceeding *pro se*.

Defendant Kimberly Chabot, also proceeding *pro se*, developed a close friendship with LeFeber after they met on the Internet in 2006. They spent two weeks together in Hawaii and had frequent telephone and email contact until Jim died in 2010. Jim left Chabot 8% of his Scottrade account.

Kristine Davenport [2] met Jim LeFeber in July of 2007. Their relationship quickly became romantic, but Jim decided to put space in the relationship in the Fall of 2007 when Davenport took a sudden interest in his money. There is no

---

[2]Davenport is an attorney on disability status with the State Bar of Montana. In February of 1994, the Montana Supreme Court suspended her from practice indefinitely after she sustained two convictions for theft. *Doc. 266-1.* Her status in the interim is unknown to the Court, but in May of 2006, the Montana Supreme Court transferred Davenport to "disability/inactive" status, concluding that "clear and convincing evidence does establish that Hawkins [Davenport is also known as Kristine Hawkins] suffers from physical and mental conditions which adversely affect her ability to practice law to the extent that she is incapacitated from the practice of law." *Doc. 266-2.*

Despite her disability/inactive status, Davenport has a history of frivolous and vindictive *pro se* litigation. *See doc. 90.* For example, the Montana Supreme Court determined earlier this year that Davenport (proceeding as Kristine Hawkins) egregiously misrepresented that she should be able to file a late appeal because her counsel died during the proceedings. *Doc. 154-1*, Order of the Mont. Supreme Court, DA 11-0175 (Jan 17, 2012). The Court noted that her counsel died more than one year before she was required to appeal her case. *Id.* True to form, Davenport claims the Supreme Court "misunderstood the situation" and she has petitioned for a rehearing. *Docs. 165, 165-2.*

In another recent case, described by the Montana Supreme Court as having a "mind-numbing" procedural history, Davenport was determined to have filed affidavits in bad faith, and prosecuted her appeal by merely repeating her "unfounded, outrageous, and conclusory accusations against everyone involved in her case." *Davenport v. Odlin*, 2011 MT 327N, 2011 WL 6932403 (Mont. 2011). That case was a misdemeanor prosecution against Davenport for speeding and maintaining community decay, to which Davenport responded by trying to disqualify the Justice of the Peace by alleging a litany of criminal and ethical misconduct. *Id.* This all sounds very familiar, as Davenport has followed the same course in this mind-numbing proceeding.

evidence of a romantic relationship between LeFeber and Davenport after 2007, but Davenport nonetheless maintains that LeFeber's TOD Plan and will are invalid and that she is entitled to his estate. Primarily, Davenport argues that she and Jim entered into an oral contract in 2007 through which he agreed to leave her everything so long as she stayed with him "emotionally" until his death. Davenport further contends that soon after this contract, LeFeber made a new will and TOD Plan putting this oral contract into effect.

Davenport has used her knowledge of the law to allege virtually every cause of action that is conceivable under her self-serving theories of Jim's estate planning, death, and cremation. Specifically, she alleges Defendants engaged in a civil conspiracy to interfere with the alleged 2007 oral contract and will through fraud, duress, undue influence, and breach of fiduciary duty, as well as other causes of actions, some of which are not recognized by Montana law. Davenport's most scandalous claims are that the Defendants murdered LeFeber and spoliated the evidence of his murder by illegally cremating him in order to prevent him from changing the estate plan he made because of Defendants' undue influence. As discussed in this lengthy Order, all these claims are patently frivolous.

Defendants Faller, LeFeber, Chabot, and Gibbons have all asserted claims against Davenport, seeking a declaratory judgment that the account be distributed

as provided by in the TOD Plan and that their attorneys fees and costs be paid by Davenport's portion of the Scottrade account. They further argue that Davenport's share of the account be held by the Court until it can be determined whether Davenport is responsible for attorneys fees incurred by Scottrade and the other Defendants. Faller further proposes that she be awarded pre-judgment interest to be paid from Davenport's share of the account and that Davenport's share be held by the Court in a constructive trust for the benefit of the other Defendants until appeals in this matter have been fully exhausted to ensure that their shares of the account not be depleted by attorneys fees.

Currently pending before the Court are nine motions for summary judgment. Shane (*doc. 162*) and Faller (*doc. 166*) have filed motions for summary judgment arguing that Jim's TOD Plan should be enforced as written and that all of Davenport's claims to the contrary are baseless. Gibbons and Chabot, proceeding without counsel, have joined in these motions. *Doc. 190.*

The remaining six motions for summary judgment are filed by Davenport. The first is against Faller. *Doc. 170.* Although the motion states it relates to all the claims between them, it really only addresses the undue influence claim, with some passing references to how Faller allegedly gave Jim an overdose of painkillers to prohibit him from changing his estate plans. *Doc. 171.* Of the two

motions for summary judgment Davenport filed against Shane LeFeber, the first is very similar to the one against Faller, *docs. 172 & 173*, while the second relates to Shane's alleged spoliation of evidence. *Docs. 176 & 177.* Davenport followed this same course of action against Gibbons, the first motion primarily addressing the alleged undue influence, *docs. 174 & 175,* whereas the second motion argues Gibbons's share of Jim LeFeber's Scottrade account should be forfeited under the equitable doctrine of unclean hands. *Docs. 178 & 179.* Finally, Davenport's sixth motion for summary judgment seeks judgment as a matter of law that she is not liable for attorneys fees incurred by Scottrade or the other Defendants in this lawsuit. *Doc. 182.*[3] Davenport did not seek judgment as a matter of law on her claims against Kimberly Chabot.

## II.  FACTUAL BACKGROUND[4]

The following facts are compiled from Shane LeFeber's Statement of Undisputed Facts ("SSUF") (*doc. 164*), Patricia Faller's Statement of Undisputed Facts ("FSUF") (*doc. 168*), Shane's Statement of Genuine Issues ("SSGI")(*doc.*

---

[3]Although it is arguable that Davenport filed serial motions for summary judgment in order to exceed the 6,500 word limit on motions for summary judgment, L.R. 7.1(d)(2)(D), it is in the interests of justice and finality to consider these motions on their merits rather than dismiss them for procedural violations.

[4]Many of the facts cited herein are supported by more than one parties' statement of undisputed facts or genuine issues, but in most cases only one citation is made.

*203*), Faller's Statement of Genuine Issues ("FSGI") (*doc. 205*), Davenport's

Statement of Genuine Issues ("DSGI") (*doc. 198*), and Davenport's Statement of

Undisputed Facts ("DSUF") (*doc. 181*). Consistent with her history in this case

and others the Court has learned about, Davenport did not comply with this

Court's Local Rules of Procedure with her statements of undisputed facts in

support of her two motions for summary judgment (*docs. 181 & 185*) or her

statement of genuine issues in opposition to the Defendants' motions (*doc. 198*).

Rather than setting forth in serial form each fact she relies on to support or oppose

a motion, coupled with citations to a specific pleading, deposition, discovery

response, or affidavit, L.R. 56.1 Davenport filed long, single-spaced narratives

that she attempts to support by the filing of affidavits in which she swears that the

facts within the statements are true and correct and based on personal knowledge.

*See docs. 180-81, 184-85, & 198-99.* The majority of these narratives are

speculative and are not supported by admissible evidence. After spending a

significant amount of time with this case, it has become clear that Davenport's

method is to take a statement in an email, hospice report, or other document,

isolate it, view it through the lens of her conspiracy theory, and then cite it as

evidence. Other than the emails and hospice reports, Davenport's only evidence is

a voided will and an unexecuted TOD Plan from 2007. But since Davenport is

proceeding pro se, even though she is an attorney and the Court has no obligation to "scour the record in search of a genuine triable fact," *Keenan v. Allen,* 91 F.3d 1275, 1279 (9th Cir. 1996), the Court will not disregard her "facts" and "issues" entirely, but will consider them on an individual basis, with the understanding that affidavits used to support or oppose summary judgment must be based on personal knowledge and set out facts that would be admissible under the Federal Rules of Evidence. Rule 56(c)(4) Fed.R.Evid. The relevant background events are as follows.

In November of 2006, Jim LeFeber started an individual brokerage account with Scottrade. SSUF, ¶ 1. Although he executed five different TOD Plans over the life of his Scottrade account–four in the three months before his death–Jim LeFeber executed the operative TOD Plan on August 10, 2010. SSUF, ¶¶ 2, 36, 55, 57, & 73. In this TOD Plan, LeFeber made the following designations: Shane LeFeber, 56%; Christopher Gibbons, 16%; Kristine Davenport, 16%; Kimberly Chabot, 8%; and Patricia Faller, 4%. SSUF, ¶ 74.

Davenport first met Jim LeFeber in 2006 at the law offices of Tipp & Buley in Missoula. FSUF, ¶ 16. LeFeber was introduced to her by his friend and attorney, Raymond Tipp. FSUF, ¶¶ 17-18. Although she now denies this, it appears she knew he was a multimillionaire from the inception of their

9

relationship.  FSUF, ¶ 19.  Their relationship became romantic in July of 2007.

SSUF, ¶ 4.  Jim LeFeber first mentioned Davenport to Shane in an email on

August 20, 2007.  SSUF, ¶ 3.

In September of 2007, Davenport alleges she and LeFeber entered into an

oral contract whereby he would make her his personal representative and give her

his entire estate if she would be his lifelong, exclusive girlfriend and stay in

Missoula.  FSUF, ¶ 25; SSUF, ¶ 5; Davenport Depo. at 70-73 (Jan. 11, 2012).  In

responses to interrogatories, Davenport described the terms of this alleged oral

contract as follows:

> He wanted a girlfriend who would stay with him (emotionally, not
> physically) until his death. He told Kris his estate was worth ca. $3.5
> million dollars and he offered Kris that if she would stay with him
> until his death he would give her his entire ca. $3.5 million dollar
> estate upon his death, would appoint Kris to be his sole personal
> representative and that the decedent would immediately execute
> estate planning documents to implement said agreement and would
> not execute any contravening estate documents, etc. Kris accepted the
> terms of the contract.

SSUF, ¶ 7.  Although she has tried to distance herself from the testimony,

Davenport testified that the alleged oral contract was a contract to make a will.

FSUF, ¶ 39.

This alleged oral contract to make a will was not witnessed by any other

person, Davenport did not make any notes of it, and LeFeber never sent Davenport any emails, letters, or any other written memorialization of the contract. SSUF, ¶¶ 9, 11, 16-18. Although Davenport testified that Jim referred to the alleged oral contract in emails to Shane, FSUF, ¶ 32, no such emails have been produced. In fact, in an email to Shane on October 3, 2007, Jim wrote "May break it off with Kris. She's all of a sudden into my money wants me to put her in my accounts as the Transfer on Death person and also do my gas wells ... DAH! I'm not into the mairrage [sic] thing neither ... FSUF, ¶ 34. This October 3, 2007 email to Shane is also noteworthy because Davenport claims she and LeFeber became engaged in September, 2007. DSGI, p. 3.

Davenport also testified that the oral contract was memorialized in LeFeber's October 7, 2007 holographic will, and that it is the only writing memorializing the contract. SSUF, ¶ 15. According to Davenport, the oral contract and the will were all part of the same transaction. FSUF, ¶ 39. The October 7, 2007 holographic will names Davenport as the personal representative and leaves her LeFeber's entire estate, with Shane as the contingent beneficiary and personal representative. SSUF, Exhibit 8, ¶¶ 19, 20. Davenport admitted at her deposition that this holographic will contains formalistic legal language and that she may have helped LeFeber write it, FSUF, ¶ 43, but more recently avers

that LeFeber drafted the holographic will on his own. DSGI, p. 3. The October 7, 2007 holographic will was not witnessed or notarized, says nothing about the oral contract, and contains none of its alleged terms except that Davenport would be the personal representative and inherit LeFeber's estate. SSUF, Exhibit 8, ¶¶ 21-26.

The next day, on October 8, 2007, LeFeber wrote "VOID," followed by his signature and date, on each page of a copy of the holographic will. FSUF, ¶ 41, Ex. 11. Davenport nonetheless testified at her deposition that as of October 2007, she and Jim LeFeber had a binding contract and that he could not change his mind about the disposition of his assets. FSUF, ¶ 40. On November 9, 2007, Jim sent Shane an email stating he wanted to "put space" in his relationship with Davenport, but "maintain the friendship." SSUF, ¶ 44. There is no evidence in the record of a serious or continuous romantic relationship between the two after this date. And Davenport has admitted she was never at Jim's house in 2010. SSUF, ¶ 130.

On September 23, 2008, LeFeber executed a will before two witnesses and a notary. FSUF, ¶ 45. This will "revoke[d] any and all Wills, Codicils and Testamentary Dispositions heretofore made by" LeFeber. FSUF, ¶ 46. In addition, the September 23, 2008 will directed that LeFeber be cremated, declared

that he was "single and unmarried," designated Shane as his personal

representative and residual beneficiary, and devised $250,000 to Defendant

Gibbons and $50,000 each to Defendants Faller, Chabot, Davenport, as well as

five others.  FSUF, ¶¶ 47-51.

On June 22, 2010, Jim emailed Shane stating that an ultra sound had

revealed a 2.0 x 3.7 cm mass on the left lobe of his liver and that he would

undergo a CAT scan the next day because there was concern it could be cancer.

FSUF, ¶ 52.  Jim emailed Shane again on June 25, 2005 explaining that 6 liver

lesions were found and that doctors were concerned about "multifocal hepatoma,

regenerating/dysplastic nodules and hypervascular metastic disease" and that he

had an "ultrasound needle biopsy scheduled for July 1."  FSUF, Ex. 16.  On the

same day, Jim told Shane he was "going to sign a full power of atty to Patty Faller

tomorrow, as she is right here and can make medical and other decisions.  If

something happens, she can also take care of the house, and [pets] Hudson and

Fritzie."  FSUF, Ex. 16.  Also on June 25, 2010, LeFeber executed a revised TOD

Plan for his Scottrade account, designating the following beneficiaries: Shane

45%, Faller 25%, Gibbons 15%, Davenport 15%.  FSUF, ¶ 56.

Around July 6, 2010, LeFeber met with Michael J. Snyder, M.D., FACP, a

board certified oncologist with Montana Cancer Specialists, "concerning

adenocarcinoma in his liver." FSUF, ¶¶ 58-59. Dr. Snyder told LeFeber that "because of the nature of the spread, an treatment would be palliative" and that "survival is likely to be measured in months, not years, and that his overall survival untreated is probably less than a year." FSUF, ¶ 61.

The next day, LeFeber executed an "Advanced Directive" that he be given treatment to maintain his dignity, keep him comfortable, and relieve his pain even if it shortened his life. FSUF, ¶¶ 62-63. The same document appointed Faller as his "Health Care Representative (Power of Attorney for Health Care)," and Shane as his "Alternate Representative," with the power to "make all health care decisions" and access his medical records. FSUF, ¶ 64.

Also on July 7, 2010, LeFeber met with Missoula attorney Thad Huse about a new will. Although Huse was on the list of names Faller provided pursuant to his request for help finding an estate planning attorney, LeFeber was actually referred to Huse by Missoula attorney Paul Ryan, who Faller had also mentioned. FSUF, ¶¶ 65-66; FSGI, ¶¶ 127-28. Huse had never before met or performed work for LeFeber or any other party to this litigation. FSUF, ¶ 67. Faller drove LeFeber to the meeting, but was asked to leave for the will discussion. FSUF, ¶ 68. In his notes regarding the July 7, 2010 meeting with LeFeber, Huse noted that LeFeber told him that Davenport was a litigator and that Huse should watch out for her.

FSUF, ¶ 73.

On July 9, 2010, LeFeber executed the will that Huse had prepared for him

before two witnesses and a notary.  FSUF, ¶ 77.  Among other things, LeFeber's

July 9, 2010 will:

(1) revoked, annulled, cancelled, and annulled all previous wills,
codicils and writings testamentary;

(2) left LeFeber's pets and residence to Faller;

(3) appointed Faller as personal representative of the estate and Shane
as successor personal representative;

(4) left LeFeber's oil, gas, and mineral rights and residuary estate to
Shane;

(5) disinherited his daughter Jacqueline Ann LeFeber and any other
individuals not named in the will; and

(6) directed that all decisions regarding his bodily remains, including
whether he was cremated or not and where his remains were placed,
be made by Faller, his personal representative.

SSUF, ¶ Ex. 14; *doc. 14-1*.

Huse avers that he prepared LeFeber's will solely at LeFeber's direction,

that neither Faller nor any other person even attempted to provide any input or

suggestions to Huse as to LeFeber's will or his estate planning, and that the only

person LeFeber identified as trying to influence his estate planning was Kristine

Davenport.  FSUF, ¶ 90-92, 96.

15

Also on July 9, 2010, LeFeber executed a Durable Power of Attorney, naming Faller as his attorney-in-fact.  FSUF, ¶ 98.

On July 13, 2010, Dr. Snyder diagnosed LeFeber with the incurable esophogeal cancer.  FSUF, ¶ 99.  Dr. Snyder explained that the goal of therapy would be to improve LeFeber's quality of life, not the length of life, since extending life is unproven under these circumstances.  FSUF, ¶ 100.  After Dr. Snyder answered LeFeber's questions, LeFeber opted to pursue hospice care with Partners In Home Care.  SSUF, ¶ 50.  Dr. Snyder concurred with the hospice care and signed a Statement of Medical Necessity for prescription medications, including morphine, for LeFeber's comfort, and issued Standing Orders regarding those medications.  FSUF, ¶ 103.  Dr. Snyder's "Certification of Terminal Illness Statement" indicated that LeFeber had less than six months to live if the disease followed its normal course.  SSUF, ¶ 51.

Upon learning of Jim's terminal diagnosis, Shane left his home in Bend, OR on July 13, 2010 and drove to visit Jim at his home, arriving on July 14, 2010.  SSUF, ¶ 53, Ex. 18.  He stayed with Jim until July 23, 2010.  *Id.*

Also on July 13, 2010, LeFeber executed the third TOD Plan for his Scottrade account, making the following beneficiary designations: Shane, 55%; Faller, 15%; Gibbons, 15%; and Davenport, 15%.  SSUF, ¶¶ 55-56.  According to

Huse's records, LeFeber called Huse on the day he made these changes to his

TOD Plan and related that Davenport was calling constantly and demanding his

entire estate, but LeFeber believed he was giving Davenport a satisfactory amount

through the TOD Plan.  FSUF, ¶ 105.

At 12:59 a.m. on July 15, 2010, Davenport sent LeFeber an email, stating

"Jim, Here's what you thought of me a year go.  What happened.?"  Following this

was the text of an email LeFeber sent to Davenport on June 26, 2009 in which

LeFeber wrote "Kris .... for your info.  Thanks so very much for all your help.

You are an angel.  Love, Jim."  FSUF, ¶ 106.  Lefeber forwarded this email to

Huse at around 8 a.m.:

> Thad ......Received this email from Kris Davenport. She did help me
> as a friend at the time I was resolving my last relationship and this
> was an e-mail I had sent thanking her, signed "Love, Jim."
>
> Now she is resurrecting this?  Being a non-practicing attorney, she
> may be thinking of breach of a verbal contract or?  Don't know.....but
> her mind is "Working"!  Thought you should know as we don't want
> anything tied up."
>
> Jim.

FSUF, ¶ 106; see also Dec. of Thad Huse, ¶ 12, Ex. 1 (Feb. 8, 2012).  In Huse's

notes memorializing conversations with LeFeber on this date, he notes that

LeFeber wanted to disinherit Davenport, but was worried that would make her

more angry and that LeFeber wanted to leave Davenport enough that she would not cause problems with his estate and his other heirs. FSUF, ¶ 107.

Continuing in the same fashion, Huse's notes regarding a July 21, 2010 meeting with LeFeber, LeFeber noted that he did not trust Davenport, that she had been yelling at him in phone calls because she wanted everything, and that Faller was scared of Davenport. FSUF, ¶ 108.

The next day, on July 22, 2010, Jim LeFeber executed his fourth TOD Plan, designating his beneficiaries as follows: Shane, 55%; Gibbons, 15%; Davenport, 15%; Faller, 7.5%; and Chabot, 7.5%. SSUF, ¶¶ 57-58.

By July 25, 2010, Shane had returned home to Oregon. Jim wrote him in an email:

> Chris [sic] Davenport called and is ragging on me about the
> distribution of my will [Scottrade], as she said I told her she'd get all
> my assets some 3 1/2 years ago or so, when I thought our relationship
> was closer than it is, but a person has a right to change their mind ....
> which I have. I believe that was in 8/2007. As I recall I'd even
> mentioned marriage at the time. Now she's a friend and that's all.
> Christ, what another deal ...... geeezzz. Have a great evening.

SSUF, Ex. 22, ellipses and [Scottrade] in original.

On the 26th of July, 2010, LeFeber arranged for his funeral plans, entering into a "Guaranteed Preneed Funeral Agreement" with Whitesitt Funeral Home. SSUF, ¶ 61. Under this "Funeral Agreement," LeFeber agreed to pay Whitesitt

Funeral Home $1810 and Whitesitt agreed to cremate LeFeber's remains. FSUF, ¶ 112, Ex. 26. A Whitesitt Funeral Home document entitled "Pre-Funeral Arrangement - Information" lists Shane and Chris Gibbons as LeFeber's "next of kin." FSUF, ¶ 114, Ex. 27. Shane, who LeFeber described as a "step son," was to sign the authorization, and Gibbons was to pick up the ashes. *Id.* LeFeber paid Whitesitt the $1810 by check dated August 28, 2010. SSUF, ¶ 80.

Also on July 26, Dr. Snyder signed the Partners In Home Care "Certification of Terminal Illness," certifying that Jim LeFeber was "terminally ill, with a life expectancy of six months or less if the disease follows its normal course." FSUF, ¶ 115; *doc. 159-5.*

Shane returned to Montana on August 2, 2010, staying until August 9. SSUF, ¶ 72.

Jim LeFeber executed his fifth and final TOD Plan on August 10, 2010, making the following beneficiary designations: Shane, 56%; Gibbons, 16%; Davenport, 16%; Chabot, 8%; and Faller, 4%. SSUF, ¶¶73-74.

Jim emailed Shane on August 12, relating a 2 1/2 hour conversation with Davenport in which she explained why she should have his entire estate. SSUF, ¶ 77.

Davenport testified at her deposition that the last time she physically saw

Jim LeFeber was some time in August 2010, when he drove to her house in Missoula. FSUF, ¶ 135, *citing* Davenport Depo, 120:1-8 (Jan 11, 2012), *doc. 168-3, p. 30.* According to Davenport, they had sex and LeFeber told her he wanted to give the Scottrade account and his estate to her and his daughter, Jacqueline Erb. *Id.* at 120:9-121:16. But Chris Gibbons avers that he did not even know Jim had a daughter until the summer of 2010 when Jim told him about her as they were driving to the funeral home. *Doc. 68, p. 4.,* Aff. Chris Gibbons (May 23, 2011). Gibbons further avers that Jim was very clear that Jim had not seen her in 30 years and wanted no contact with her. *Id.*

LeFeber signed a "Montana Provider Orders for Life Sustaining Treatment" ("POLST") on August 25, 2010, making clear that he did not want to be resuscitated, wanted a natural death, and did not want any heroic or life-saving measures taken. SSUF, ¶ 78, Ex. 27. LeFeber also chose the lowest level of medical interventions, indicating that he wanted to be kept comfortable, but did not want to be transferred to a hospital for life-sustaining treatment–transfer to a hospital was wanted only if LeFeber's "comfort needs could not be met in current location." *Id.* This is consistent with the hospice nurse's notes from an August 4, 2010 visit indicating that Jim was very clear with the nurse and Shane that he did not want 911 called for any medical condition. FSUF, ¶ 120. Dr. Snyder signed

the POLST on August 26, 2010.  SSUF, ¶ 79, Ex. 27.

Shane returned to Montana to visit Jim on August 30, 2010.  SSUF, ¶ 81.
He left on September 12, 2010 and did not return until after Jim's death.  SSUF, ¶
82.

The hospice nurse notes from a September 14, 2010 visit indicate Jim's
appearance had noticeably changed since an earlier visit that day.  He was now
pale, with a "cancer look of grayness."  His mood had also changed to calm and
lethargy, whereas earlier in the day he was "slightly irritable" and "completely
resistant to comfort med suggestions."  The nurse commented that Jim was
"declining rapidly r/t disease progression."  The records further reveal that Jim had
started asking for morphine at 4:00 p.m., had taken oral morphine and tramadol,
and that a syringe pump was set up to administer morphine at Jim's request so that
he could get enough pain relief to sleep without being reliant on his caregivers.
FSUF, ¶ 138.

Hospice records reveal that on September 15, 2010, Jim removed the
morphine syringe after only an hour because he felt it would increase his bleeding
and keep him from mowing the lawn.  FSUF, ¶ 139.  The record also makes clear
that Faller was honoring Jim's wishes about abstaining from pain medications.  *Id.*
At some time on the 15th, however, Jim agreed to have the morphine syringe

reinstated.  FSUF, ¶ 140.

Jim LeFeber died at his home on September 15, 2010 at 11:38 a.m, SSUF, ¶ 83, ex. 29, as the on call hospice nurse was conducting a follow up home visit to "check status after medication changes to address continued terminal restlessness symptoms."[5]  SSUF. Ex. 32., p. 2.  The Hospice Discharge Summary Report indicates Jim "Expired @ home–symptoms controlled, died peacefully" and that his pain was controlled with a morphine pump.  FSUF, ¶ 142.  The Hospice Interdisciplinary Team Report dated September 16, 2010 notes that Jim had "significant disease related physical and mental decline over [the] last  2 weeks."  SSUF, ¶ 85.

Dr. Snyder certified LeFeber's certificate of death on September 16, 2010, indicating that he died naturally of esophageal cancer.  FSUF, ¶ 145-47.  Snyder avers that the date and manner of LeFeber's death was consistent with his diagnosis and prognosis.  FSUF, ¶ 148.

Dean Whitesitt, a licensed mortician, authorized the removal, transport, and

---

[5]There is some confusion as to whether LeFeber died in the a.m. or p.m.  The Death Certificate provides that he died at 11:38 military time.  The Court understands this to mean 11:38 a.m.  Other documents in this case, however, indicate that LeFeber died at 11:38 p.m.  *E.g.* FSUF, ex. 33 (indicating the hospice nurse's on call visit began at 22:54 on 9/15/10 and concluded at 1:49 on 9/16/10 and that LeFeber died during the visit); *doc. 264, p. 10*.   In any event, the evidence is undisputed that LeFeber died on September 15, 2010 and the actual time is not relevant to any issue in this case.

final disposition of LeFeber's remains on September 16, 2010.  FSUF, ¶ 154.  The

next day, LeFeber was cremated at the Daly-Leach Crematory after Shane signed

the Cremation Authorization, FSUF, ¶ 155, Ex. 39, just as LeFeber had provided

for in his July 26, 2010 Funeral Agreement.  SSUF, ¶ 105.  Shane had driven to

Montana from Oregon on September 16.  SSUF, ¶ 103.

On September 22, 2010, an Application for Information Probate of Will and

Appointment of Personal Representative for the Estate of James Albert LeFeber

was filed in Montana's Twenty-First Judicial District Court, Ravalli County, as

Cause No. DP-10-75.[6]  FSUF, ¶ 160.  Although Davenport is aware that LeFeber's

July 9, 2010 will is being probated in Cause No. DP-10-75, she has not appeared

in that proceeding to contest the will.  FSUF, ¶ 167.  Davenport testified at her

deposition that this lawsuit is her will contest and, in addition to seeking

LeFeber's Scottrade account, she will ask this Court to vacate or modify any

orders entered by the Ravalli County court in the probate action.  *Id.*

On October 28, 2010, Davenport filed a complaint, Case No. DV-10-41, in

Montana's Fourth Judicial District Court, Missoula County against James

LeFeber, by and through Jacqueline Erb, who she alleges is his successor in

---

[6]   It appears the probate action awaits resolution of this case since there has been little
activity in the case as of June 4, 2012

interest.[7]  SSUF, ¶¶ 114-115.  This lawsuit alleges LeFeber breached a contract with Davenport providing that he would appoint her as the personal representative of his estate and leave her all his assets.  SSUF, ¶ 116.  The Missoula County lawsuit, combined with Davenport's refusal to allow the disposition of the funds as provided for in the TOD Plan, caused Scottrade to file this lawsuit.  *Doc. 1, ¶¶ 14-18.*

## III.  ANALYSIS

A movant is entitled to summary judgment by showing that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law.  *Anderson, v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact.  *Anderson*, 477 U.S. at 256-57.  Once the moving party has done so, the burden shifts to the opposing party to set forth specific facts showing there is a genuine issue for trial.  *In re Barboza*, 545

---

[7]As of June 4, 2012, there has also been little activity in this case.

F.3d 702, 707 (9th Cir. 2008). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Id.*

On summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Id.* The court should not weigh the evidence and determine the truth of the matter, but determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Essentially, the question on summary judgment is "whether the evidence presented a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *McSherry v. City of Long Beach,* 584 F.3d 1129, 1135 (9th Cir. 2009).

Since the issues raised by all the motions are intertwined, the Court will addresses issues and arguments rather than individual motions. Davenport's frivolous arguments, circular reasoning, *ipse dixit* justifications, and lack of procedural knowledge have greatly complicated this case, resulting in a crowded record. Although it is impractical and unnecessary to address every superficial argument, the Court has done its best to comprehensively reject Davenport's claims so that the Court of Appeals can quickly dispose of Davenport's expected appeal and Jim LeFeber's estate can be distributed as he intended.

## A.    THE **TOD** PLAN IS ENFORCEABLE

Montana law expressly recognizes TOD Plans such as the one executed in this case as valid, nontestamentary transfers.  *Matter of Estate of Lahren,* 886 P.2d 412, 415-16 (Mont. 1994), *citing* Mont. Code Ann. § 72-6-111.  Upon Jim LeFeber's death on September 15, 2010, SSUF, ¶ 83, ownership of the account automatically passed to the designated beneficiaries.  Mont. Code Ann. §§ 72-6-307, 309(a).

In fact, Davenport testified at her deposition that the TOD Plan would transfer ownership of LeFeber's Scottrade account to the designated beneficiaries upon his death, regardless of any will.  FSUF, ¶ 124.  Moreover, LeFeber's will dated July 9, 2010 expressly stated that intangible personal property requiring beneficiary designations, including "Transfer on Death accounts–shall pass to the Beneficiar[ies]" he designated.  FSUF, ¶ 83.  The attorney who drafted LeFeber's will expressly advised him of this fact.  FSUF, ¶ 84.

Nonetheless, Davenport makes numerous frivolous attempts to undo Jim LeFeber's careful deliberate efforts to leave her 16% of this Scottrade account and nothing more.

## B.    THERE IS NO ORAL CONTRACT INVALIDATING THE TOD PLAN

Although she has changed her position in the summary judgment papers,

Davenport admitted at her deposition that the alleged 2007 contract was a contract to make a will. FSUF, ¶ 39. Such contracts are disfavored because "at the time of enforcement one of the parties is dead and obviously cannot confirm or deny the existence of the contract." *Orlando v. Prewett,* 705 P.2d 593, 598 (Mont. 1985). Accordingly, the other Defendants argue the contract's validity is governed by Montana Code Annotated § 72-2-534, which governs the establishment of contracts "to make a will or devise or not to revoke a will or devise or to die intestate." *Orlando,* 705 P.2d at 696; *Estate of Braaten,* 96 P.3d 1125, 1126 (Mont. 2004).

Davenport offers several arguments why § 72-2-534 is inapplicable.[8] Davenport first attempts to distance herself from her deposition testimony that the 2007 oral contract was a contract to make a will, claiming the oral contract was a contract to "give her his entire estate and that the means by which he would give her his estate was up to him" and that he could have done so by a will, at-death benefit, *inter vivos* gift, TOD benefit, etc. *Doc. 197, p. 22.* She also argues that § 72-2-534(1) does not concern contracts to give a person non-probate assets.

---

[8] Davenport also argues that if § 72-2-534(1) is applicable, she should be able to claim the entire probate estate under a promissory estoppel action based on fraud. But the deadline for amending pleadings passed eight months ago, *doc. 92,* and Davenport has already alleged enough frivolous causes of action and there is no factual basis for such a claim.

Davenport, however, is wrong.

First, Davenport's claim that the alleged oral contract allowed LeFeber to give her his entire estate by any means contradicts her interrogatory response quoted above explaining that their contract required LeFeber to "give her his entire ca. $3.5 million dollar estate upon his death ..." SSUF, ¶ 7. Further, the comments to § 72-2-534 plainly state that its purpose is to "tighten the methods by which contracts concerning succession may be proved" and the public policy behind the statute is to discourage false post-mortem claims based upon oral promises. *Orlando*, 705 P.2d at 598. If the distinction proposed by Davenport were applicable, the statute could be easily evaded by unscrupulous claimants claiming a decedent contracted to leave his estate by any non-probate transfer. Finally, the *Orlando* Court applied § 72-2-534 in a case where the precise details of the contract were unknown, but it was clear that the intent of the oral agreement was for one party to leave property to the another at death. 705 P.2d at 596. Accordingly, § 72-2-534 controls the validity of the oral contract that Davenport alleges entitles her to James LeFeber's estate and Scottrade account.[9]

_____

[9] Although LeFeber revoked the 2007 holographic will, both by "voiding" it the next day and by executing two subsequent wills that superseded and revoked all prior wills, Mont. Code Ann. § § 72-2-527(1)(a) & (b), Davenport also claims that one of the terms of their oral contract was that LeFeber not execute contrary estate planning documents. Regardless, there is no valid oral contract requiring LeFeber to leave all of his wealth to Kristine Davenport. Accordingly, there is no need to address whether LeFeber complied with the contract by executing the

Section 72-2-534(1) provides:

(1) A contract to make a will or devise or not to revoke a will or devise or to die intestate, if executed after July 1, 1975, may be established only by:

(a) provisions of a will stating material provisions of the contract;

(b) an express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or

(c) a writing signed by the decedent evidencing the contract.

Although Davenport has admitted that the October 7, 2007 holographic will is the only writing evidencing her alleged oral contract with LeFeber, SSUF, ¶¶ 15-18, she argues in the summary judgment papers that an unexcuted TOD Plan from October 2007 and some of Jim's emails to Shane evidence the alleged contract. The Court first considers whether the holographic will satisfies any of the three subsections of § 72-2-534(1) before considering these others writings.

First, since the 2007 holographic will says nothing about the alleged contract, there is no "express reference" as required by § 72-2-534(1)(b).

Second, one of the essential elements of a contract is consideration. Mont. Code Ann. § 28-2-102. The 2007 holographic will says nothing about Davenport

_____

holographic will, or whether he violated the contract by revoking the holographic will and executing subsequent wills and TOD Plans.

being LeFeber's exclusive "romantic woman" as consideration for being named LeFeber's personal representative and an inheriting his estate. Nor is the Scottrade account mentioned. Without any mention to the Scottrade account or Davenport's consideration, the Court cannot conclude that the 2007 holographic will states the material provisions of the contract as required by § 72-2-534(1)(a).

Third, there is no "writing signed by the decedent evidencing the contract" as required by § 72-2-534(1)(c). As noted, the 2007 holographic will is not inconsistent with Davenport's claim to the entire estate, but it does not "evidence" the contract. It makes no mention of any contract.

Similarly Davenport also claims that a TOD Plan signed by LeFeber on October 5, 2007 that lists Davenport as the sole beneficiary "evidences" the contract, *doc. 171-11,* but like the October 2007 holographic will, that TOD Plan does not mention any contract. Moreover, the October 5, 2007 TOD plan was never valid because it was never signed and accepted by Scottrade, nor was it notarized like LeFeber's other TOD Plans.

Finally, Davenport claims LeFeber referred to the contract in emails with Shane. Although Davenport does not cite the particular email, she must be referring to the July 25, 2010 email quoted above in which LeFeber complained to Shane that Davenport was "ragging" on him about the distribution of his

Scottrade account, explaining:

> she said I told her she'd get all my assets some 3 1/2 years ago or so,
> when I thought our relationship was closer than it is, but a person has
> a right to change their mind .... which I have. I believe that was in
> 8/2007. As I recall I'd even mentioned marriage at the time. Now
> she's a friend and that's all. Christ, what another deal ...... geeezzz.

SSUF, ¶ 22. Again, this email does not "evidence" a contract through which

Davenport would be James LeFeber's exclusive "romantic woman" in exchange

for all his assets upon his death. Further, this email is not "signed by the

decedent" as required by § 72-2-534(1)(c). Although a typewritten name can

constitute a signature where the necessary intent to authenticate is shown,

*Hillstrom v. Gosnay,* 614 P.2d 466, 469 (Mont. 1980), the July 25, 2010 email is

not "signed" and is certainly not signed with any intent to authenticate the

signature.

Davenport may also be referring to an August 12, 2010 email from Jim to

Shane, where Jim relates that his day "has included a 2 ½ hour conversation

listening to Kris Davenport tell me why she deserved my entire estate. Geeezzz.

Oh Well! Whatever happened or was said 4 yrs. or so ago can certainly be

changed ..." SSUF, ¶ 77. Again, this email is not signed by James LeFeber and

does not evidence any contract.

Davenport also argues her performance under the contract excuses strict application of § 72-2-534 as partial performance does in other situations involving the statute of frauds. But even if it was established that Davenport fully performed her duties under the alleged contract[10], the Montana Supreme Court has expressly rejected a performance exception to § 72-2-534. *Orlando,* 705 P.2d at 598. The Court made clear there are no exceptions to the statute. *Orlando,* 705 P.2d at 596.

Accordingly, Shane, Faller, Gibbons, and Chabot are entitled to judgment as a matter of law that there is no oral contract entitling Davenport to James LeFeber's probate estate or anything more than the 16% of the Scottrade account as designated in the TOD Plan. Further, there being no valid contract, they are also entitled to judgment as a matter of law in their favor on any claim by

---

[10]It is also unlikely that Davenport could prove she remained LeFeber's "romantic woman" until his death, as there is no evidence in the record of a close relationship between Davenport and LeFeber after LeFeber's October 3 and November 9, 2007 emails to Shane indicating that he might "break it off" with Kris and "put space" in their relationship. Davenport states in her SUF that although Jim drove to Missoula to see her every day in 2007, that did not happen in 2008. *Doc. 181,* DSUF, p. 3. Moreover, despite Davenport's statement that "Jim and Kris's romantic relationship continued to his death [,] Kris complied with the terms of the contract and stayed with Jim emotionally until his death, never leaving him for another man," *doc. 198,* DSGI, p. 3, there is little evidence in the record of a "romantic relationship" between Davenport and LeFeber after 2007. The best Davenport can do is point to cards from Jim in 2008 and 2010 and an email in 2009. DSGI, p. 3. Also noteworthy is Davenport's admission that she was never at LeFeber's house from January 1 to November 1, 2010 and could not name any dates she was physically present with LeFeber during that time, SSUF, Ex. 4

Davenport for tortious interference with contract.[11]

### C. DAVENPORT'S TORTIOUS INTERFERENCE WITH EXPECTANCY CLAIM ALSO FAILS

The Montana Supreme Court has yet to recognize a cause of action for tortious interference with expectancy or inheritance. *Hauck v. Seright,* 964 P.2d 749, 753 (Mont. 1998). Since the Supreme Court has found no reason to adopt the cause of action because an undue influence claim provides the same remedy, this Court has also refused to recognize the cause of action. *Hadacheck v. Feeley,* CV-06-17-BLG-RFC, Order Re: Feeley's Motion for Summary Judgment, *doc. 161,* pp. 16-18 (Dec. 7, 2007). Accordingly, judgment as a matter of law must be entered against any claim Davenport has for tortious interference with inheritance or expectancy.

### D. UNDUE INFLUENCE

Davenport devotes most of her briefing to her claim that the other Defendants placed undue influence on LeFeber so that he would breach the alleged contract to leave Davenport his entire estate and include them in his will and TOD Plan. A review of the record makes clear that the evidence is so one-

---

[11]Even if there were a contract between Davenport and LeFeber, there is no evidence any Defendant did anything to interfere with it. If there was a contract, James LeFeber chose not to honor it on his own volition.

sided that this claim cannot proceed. Especially as to Chabot, who was never

even in the same state as Jim LeFeber during the relevant time period. Indeed,

Davenport's claims against Chabot are the most frivolous and vindictive of her

many frivolous and vindictive claims.

> Under Montana law, undue influence consists of:
>
> (1) the use by one in whom a confidence is reposed by another person
> or who holds a real or apparent authority over the other person of the
> confidence or authority for the purpose of obtaining an unfair
> advantage over the other person;
>
> (2) taking an unfair advantage of another person's weakness of mind;
> or
>
> (3) taking a grossly oppressive and unfair advantage of another
> person's necessities or distress.

Mont. Code Ann. § § 28-2-407. The Montana Supreme Court has made clear that

the mere opportunity to exercise undue influence is insufficient–to survive

summary judgment, Davenport must present admissible evidence of specific acts

of undue influence. *In re Estate of Harmon*, 253 P.3d 821, 827 (Mont. 2011).

Davenport can point to no specific acts of undue influence on the part of any

Defendant and judgment as a matter of law can be entered against her on that

point alone. But since the Court expects Davenport to try to make good on her

threat to "make this case go on for years and years" with her circular logic and

*ipse dixit* justifications, *see doc. 80, p. 10,* the Court will make a careful record, considering all of Davenport's speculative "evidence" of a conspiracy to unduly influence James LeFeber.

Through the Declaration of Thad Huse, the attorney who drafted LeFeber's July 9, 2010 will and advised his estate planning during the last months of his life, the Defendants have shown that the only person who was trying to influence James LeFeber's estate planning was Kristine Davenport. *Doc. 160, ¶ 11.* Huse further avers that he prepared the will solely at LeFeber's direction, worked from a draft will written by LeFeber himself, and that "[n]o one other than James LeFeber provided, or attempted to provide, any direction, input, or suggestions to me with respect to the provisions in James LeFeber's July 9, 2010 will or with respect to his other estate planning matters." *Id.* at ¶¶ 10, 23. In support of his averments, Huse provides emails sent to him by LeFeber and notes of conversations he had with LeFeber in July and August of 2010 that document LeFeber's concern that Davenport would cause problems with his estate and his other heirs. *Id.* at ¶¶ 12-21. The record presented by Defendants makes clear that LeFeber knew Davenport would challenge his estate plan and he sought Huse's assistance to ensure that his wealth would be distributed according to his plan.

Consistent with her modus operandi, Davenport claims Huse was just

another part of the conspiracy. According to Davenport, Faller and Shane exerted duress on LeFeber to get him to go to Huse for the will and that "Jim would have never voluntarily switched attorneys from his longtime attorneys Tipp and Buley," "[h]e went to Huse solely under duress and pressure from the Defendants, etc." DSUF, p. 4; DSGI, p. 5. But Davenport's narrative, speculative "affidavits" are insufficient to raise a genuine issue of material fact as to whether LeFeber freely selected Huse to handle his estate planning. LeFeber ended up using Huse, who did not previously know Faller or any other party to this litigation, because he was referred to him by another Missoula attorney, Paul Ryan. *Doc. 160,* ¶¶ 3-4. Initially, LeFeber asked Faller for help finding an estate planning attorneys. FSGI, ¶ 127, ex. 14. Both Paul Ryan and Thad Huse were on this list, but LeFeber ended up using Huse because he was referred to Huse by Paul Ryan. FSUF, ¶ 66.

Davenport claims summary judgment should be granted in her favor on her undue influence claim, or at least that genuine issues of material fact preclude summary judgment for Defendants, because Defendants were in a confidential relationship with LeFeber and there are "suspicious circumstances" surrounding the preparation of his final will and TOD Plan. Specifically, Davenport cites comment (f) of § 8.3 of the Restatement Third, Property (Wills and Other

Donative Transfers), for the proposition that a confidential relationship, coupled with "suspicious circumstances" surrounding the preparation and execution of the will and TOD Plan, establish a presumption of undue influence. For the purposes of these summary judgment motions, it is assumed that Defendants were in a confidential relationship with James LeFeber.

Notwithstanding the Restatement, it is well-established that undue influence is "never presumed" under Montana law. *Wittman*, 27 P.3d at 38; *Christensen v. Britton,* 784 P.2d 908, 911 (Mont. 1989); and *Stanton v. Wells Fargo Bank Montana, N.A.,* 152 P.3d 115, 120 (Mont. 2007) (expressly refusing presumption of undue influence, even where attorney prepared estate documents of which he was the sole beneficiary). Neither the existence of a confidential relationship nor the opportunity to exercise undue influence are sufficient to survive summary judgment, Montana courts must "consider and correlate the opportunity to exercise undue influence with the alleged acts of influence to determine if the acts amount to undue influence." *Stanton,* 152 P.3d at 120.

The Montana Supreme Court has consistently relied on five factors in determining whether there has been undue influence, *In re Estate of Harmon*, 253 P.3d 821, 826 (Mont. 2011), but Davenport argues the eight factors listed in the Comment (h) of Restatement § 8.3. Although there is no evidence of undue

influence under any set of factors, the Court will give Davenport the benefit of the doubt and refute her claims by tracking her "analysis." As noted, under the Restatement analysis, a presumption of undue influence arises where there is a confidential relationship and there are suspicious circumstances surrounding preparation, execution, or formulation of the donative transfer. Restatement (Third) of Property: Wills and Other Donative Transfers § 8.3 cmt. h (2011).

In determining whether there are "suspicious circumstances," the Restatement advises that courts consider all relevant factors, including eight specified factors:

(1) the extent to which the donor was in a weakened condition, physically, mentally, or both, and therefore susceptible to undue influence;

(2) the extent to which the alleged wrongdoer participated in the preparation or procurement of the will or will substitute;

(3) whether the donor received independent advice from an attorney or from other competent and disinterested advisors in preparing the will or will substitute;

(4) whether the will or will substitute was prepared in secrecy or in haste;

(5) whether the donor's attitude toward others had changed by reason of his or her relationship with the alleged wrongdoer;

(6) whether there is a decided discrepancy between a new and previous wills or will substitutes of the donor;

(7) whether there was a continuity of purpose running through former wills or will substitutes indicating a settled intent in the disposition of his or her property; and

(8) whether the disposition of the property is such that a reasonable person would regard it as unnatural, unjust, or unfair, for example, whether the disposition abruptly and without apparent reason disinherited a faithful and deserving family member.

*Id.*

### 1. The extent to which the donor was in a weakened condition, physically, mentally, or both, and therefore susceptible to undue influence

Under the first restatement factor, it cannot be disputed that the July 2010 will and August 2010 TOD Plans were executed as LeFeber's health was declining rapidly. Davenport cites hospice reports from July 21 and 22, 2010, stating that Jim's "Alertness/Level of Consciousness" was "confusion" and that Faller had noted a "significant increase in confusion over the last week." *Doc. 173-4.*

It is also clear, however, that much of this confusion concerned his illness and the medication he was taken, as LeFeber did not want to be overly medicated as he was dying. It was specifically noted that Jim was "suspicious and confused about the 2 minor med changes recommended" and did "not understand why [hospice nurse] keeps bringing in 'all these meds.'" *Id.* As this was less than two weeks after his terminal diagnosis, the Hospice nurse noted that Shane and Faller advised that "James is still adjusting to his terminal diagnosis, is resistant to any

39

change and is having more confusion." *Id.* Although Jim's confusion was documented, the hospice nurse believed that Jim could still drive as long as he was not alone and stayed off the highway. *Id.*

Finally, there are other hospice records Davenport did not cite that say the opposite. Assuming they are indicative of LeFeber's susceptibility to undue influence, a September 8, 2010 report provides "[t]here is no way to manage patient's meds by either [the hospice nurse or other caregivers] as James is still mentally intact enough and emotionally strong about not losing control of this task." *Doc. 173-11.* Other records provide that LeFeber was "active & independent," "able to interact in meaningful way," "not easily distracted," and "[a]ble to evaluate a situation and determine appropriate action." FSGI, ¶¶ 63-64.

In most cases, the victim of undue influence suffers from dementia or other weakness of mind. *E.g, In re Estate of Lightfield,* 213 P.3d 468 (Mont. 2009). There is no such evidence in this case. Rather, the evidence reflects that Jim knew exactly what he was doing when he assisted his lawyer in carefully planning his estate.

## 2. The extent to which the alleged wrongdoer participated in the preparation or procurement of the will or will substitute

Davenport argues that Faller coerced Jim into using Thad Huse for his final estate planning, but all Faller did was provide Jim with a list of estate planning attorneys as he had requested. FSGI, ¶ 127, ex. 14. Both Paul Ryan and Thad Huse were on this list, but LeFeber ended up using Huse because he was referred to Huse by Paul Ryan. FSUF, ¶ 66. Huse had never before met nor performed work for anyone involved in this lawsuit. FSUF, ¶ 67. Davenport also notes that Faller drove LeFeber to his appointments with Huse, including the appointment where LeFeber signed durable and healthcare powers of attorney, but Faller avers that she only went places with Jim when he asked her to, FSUF, ¶ 174, and Huse's notes reveal that Faller was asked to leave for the will discussion. *Doc. 160-2, p. 1.* Faller has also averred that she was Jim's friend for many years, never asked him to leave her any property or anything else upon his death, and never asked or persuaded him to be his attorney-in-fact or personal representative. FSUF, ¶¶ 171-173. This is consistent with Huse's averment that Faller did not provide, or attempt to provide, any input on LeFeber's will or other estate planning matters. *Doc. 160, ¶ 9.*

As to Shane, Davenport claims he contacted Faller–who Davenport alleges

was most actively procuring the will–before it was executed.  Although Davenport

supplies an email from Shane to Faller on February 9, 2010, the day LeFeber's will

was signed, the email exchange primarily involves Jim's lack of appetite, and

certainly does not evidence any conspiracy to procure estate planning beneficial to

them.  *Doc. 173-5.*  Davenport also claims Shane arrived at LeFeber's house on

July 14, 2010 and stayed with him for 10 days while he "closely associated with

Faller."  Although it is established that Shane did arrive on July 14 and stayed with

Jim for 10 days, *doc. 164-18, p. 6,* and also that Shane spent a lot of time with Jim

at his house off and on until he died, there is no evidence that Shane and Faller

conspired to get their hands on Jim's money.  Davenport also claims that when

Shane arrived on the 14th, Shane and Faller accompanied LeFeber to his bank,

where LeFeber added their names to his accounts, but this allegation is also

unsupported.  And even if it were true, it is not suspicious considering that Jim had

just designated Faller his personal representative and attorney-in-fact and Shane

was his "step son" and primary beneficiary.  Davenport also notes that Shane took

Jim to Huse's office on July 14, 2010, but again, there is nothing exceptional about

this.  Jim was dying of cancer and Shane was there to take care of him.

Finally, Davenport notes that on August 1, 2010, Shane offered to help Jim

with some of his "legal jumbo."  Jim had complained that he had questions about

his living revocable trust and that he had thought it would be easier than a will. Shane asked if there was anything he could do to help and Jim said no, that he would do the best he could, that "all of this legal jumbo is just .... jumbo" and that he may just forget the revocable living trust. The final email in the chain contains Shane's response that he was looking forward to seeing Jim the next day and that with two sets of eyes they might be able to figure out the "Jumbo" Jim was referring to. *Doc. 173-7, p. 1.* When you consider that Shane had been the primary beneficiary of LeFeber's estate since 2006, it is obvious that he had no motive to unduly influence Jim and it is not suspicious that Shane wanted to help Jim.

With respect to Gibbons, Davenport claims that he drove to LeFeber's home on the day Jim was diagnosed with cancer and stayed with him almost constantly until he died so Gibbons could ensure himself a share of LeFeber's wealth. But Like Faller and Shane, Davenport can point to no specific acts of undue influence by Gibbons. Gibbons had known LeFeber for over thirty years. On July 9, 2010, LeFeber "called and asked me to come as soon as possible because he told me he had terminal cancer. He said he had only months to live." Chris Gibbons's Affidavit, *doc. 68,* pp. 3-4. He stayed through the weekend, went back home to work during the week and returned the next weekend to "spend some time and help Jim with things he was requesting [Chris] do." *Id.* at p. 4. Chris spent more and

more time with Jim as the cancer progressed because Jim wanted him there as much as possible.  Jim specifically asked that Chris be there with him when he died, so Chris spent the next few months caring for him, making household repairs, and fixing up Jim's old Ford truck so Shane could take it back to Oregon.  *Id.* According to Gibbons, Jim LeFeber had told him that he wanted to leave him and his family a gift, but that he never asked and Jim never told him what the gift would be.  Jim told Gibbons he had a will, but they never discussed  specifics.  *Id.* at p. 8.

At best, Davenport can prove that Defendants had access to Jim LeFeber and opportunities to unduly influence him.  But the mere opportunity to exercise undue influence is insufficient, there must be admissible evidence of specific acts of undue influence to survive summary judgment.  *Estate of Harmon*, 253 P.3d at 827. Davenport has only speculation.

        **3.**      **Whether the donor received independent advice from an attorney or from other competent and disinterested advisors in preparing the will or will substitute**

Davenport makes a big deal of the fact that LeFeber went to a different attorney for his final estate planning than his friend Raymond Tipp, of Tipp & Buley in Missoula.  She claims Jim never would have willingly switched from his

"longtime attorneys" and that because he went to Huse, he did not get "independent advice from his own attorneys." Again, Davenport's word is the only evidence of this.

Raymond Tipp of the Tipp & Buley firm in Missoula represented LeFeber in a property dispute with a former girlfriend, Shane's mother Maggie Johnson. FSGI, ¶ 120. Tipp also drafted LeFeber's November 11, 2005 will. FSUF, Ex. 2; *doc. 168-10,* Depo. Raymond Tipp, 18:4-11 (Jan. 13, 2012). After the conclusion of the property dispute, Jim remained friends with Raymond Tipp and visited him at his office on the weekends until Jim became sick. FSGI, ¶ 125.

Faller said that after Jim was diagnosed with terminal cancer, he asked Faller for help finding an estate planning attorney. FSGI, ¶ 127. Faller wrote down the names of some attorneys, including Thad Huse, on two memo pad pages and gave them to Jim. FSGI, ¶ 127, ex. 14. From the handwritten notes Jim made on those two pages, it appears Jim called some of those attorneys and may have considered some attorneys that Faller did not suggest. *Id.* Although his name was on Faller's list, Huse avers that Jim came to him on referral from Paul Ryan and that he had never met nor performed work for any other party to this lawsuit. FSGI, ¶¶ 128-29. In an email to Shane dated July 7, 2010, Jim told Shane that he was "[s]eeing any atty. today to get a Living Will, Medical Power of Atty. and a Revocable Living

Trust drawn up." FSGI, ¶ 130.  When Shane asked whether Jim was going to Tipp and whether Tipp did those things, Jim responded: "Not Tipp.  Another Atty.  May not make you my personal representative as your in Bend, Org. and things may need to be done quickly here in Missoula."  FSGI, ¶ 130.

The fact that Jim chose a new attorney for his final estate plan is not indicative of undue influence.

### 4. Whether the will or will substitute was prepared in secrecy or in haste

Jim first met with Thad Huse on July 7, 2010.  FSUF, ¶ 65.  By July 9, 2010, he had signed the will that Huse prepared for him.  FSUF, ¶ 77.  According to Davenport, this shows that the will was hastily prepared and evidence of undue influence.  But considering that Jim had learned by June 25 that he had 6 lesions on his liver, FSUF, ¶ 54, had begun to consider the distribution of his wealth and plan for his care in late June, FSUF, ¶¶ 55-56, it really only shows that Jim LeFeber was trying to get his affairs in order.  The first meeting with Huse to prepare a new will came one day after Dr. Snyder told him that if his disease was untreated he had less than a year to live and that any treatment would be palliative.  FSUF, ¶ 61.

**5.     Whether the donor's attitude toward others had changed by reason of his relationship with the alleged wrongdoer,**

Since any objective consideration of the facts in this case reveals that Davenport is the only wrongdoer, this factor has little application here.  In any event, Jim knew the other Defendants, especially Shane and Gibbons, far longer than he knew Davenport.  And there is no evidence the other Defendants knew much about Davenport or her relationship with Jim.  Although there is evidence that the other Defendants overheard Davenport screaming at Jim about his estate planning, *doc. 68, pp. 5-6,* there is no evidence they influenced Jim's view of her.  The only evidence of a changed relationship in this case is that Jim and Davenport were lovers in the Summer of 2007, but by the Fall of 2007 Jim wanted to "put space in the relationship" after she became too interested in his money.

**6.     Whether there is a decided discrepancy between a new and previous wills or will substitutes of the donor, and whether there was a continuity of purpose running through former wills or will substitutes indicating a settled intent in the disposition of his property**

Contrary to Davenport's view of the evidence, there is consistency in James LeFeber's estate planning.  LeFeber had not seen his daughter in decades, had no other family, and a review of all the wills and TOD Plans demonstrates a settled intent to leave the majority of his wealth to Shane, and to distribute the remainder

to his closest friends.  The only inconsistency in his plans occurs in October 2007, when it appears Davenport pressured Jim to execute the holographic will that he cancelled the next day and the October 5 TOD Plan that he never executed.

Davenport claims that from 1991 to 2005, LeFeber's co-habitating girlfriend Maggie Johnson was designated to inherit LeFeber's wealth, but that when she left LeFeber in 2005, he left his estate to Shane.  Although there is no evidence to confirm Davenport's claim that he did so because Shane sided with LeFeber over his mother in their dispute, the November, 2005 will, prepared by Raymond Tipp around the same time he was handling the lawsuit with Maggie Johnson, left the entire estate to Shane.  FSUF, ¶ 15.  Similarly, when Jim opened his Scottrade account in November of 2006, Shane was the sole beneficiary.  SSUF, ¶ 2.

Davenport stresses that in October 7, 2007, Jim signed the holographic will leaving everything to Davenport.  But assuming this will was ever valid, it was only valid until he signed his name under the word "VOID" on both pages the next day.[12]  FSUF, ex. 11.  Similarly, Davenport has produced an unexecuted copy of a TOD Plan dated October 5, 2007, which names Davenport the 100% beneficiary

_____

[12]In another ridiculous argument, Davenport claims the 2007 holographic will is still valid because when LeFeber revoked his 2005 will, he wrote the word "revoked" on it, but he wrote "void" on the 2007 holographic will.  Davenport thus claims LeFeber differentiated the terms, and since he wrote "void" on the copy of the holographic will, she claims LeFeber simply meant that the photocopy was not the original will.

and Shane the 100% contingent beneficiary. *Doc. 171-11.* Unlike the five other TOD Plans signed by LeFeber, it was neither notarized nor approved by Scottrade. It must be noted that this unexecuted TOD Plan and holographic will occur at what appears to be the height of LeFeber's relationship with Davenport, in the month after the alleged oral contract and days after LeFeber wrote an email to Shane stating that he was considering breaking off his relationship with Davenport because of her sudden interest in being named his "Transfer on Death person." SSUF, ¶ 13.

Although it is ignored by Davenport in her arguments regarding the inconsistency in LeFeber's estate planning, LeFeber's final estate plan takes shape with his September 23, 2008 will. FSUF, ¶ 45. Like his subsequent will and TOD Plans, Shane is the primary beneficiary, but Davenport and the other Defendants are included, with Gibbons given $250,000, and Faller, Davenport, and Chabot given $50,000 each. FSUF, ¶¶ 50-51. Unlike his 2010 will, however, there are five other beneficiaries designated to receive $50,000 each. FSUF, ¶ 50.

Nothing changes until June 25, 2010, when LeFeber learned he may have cancer, FSUF, ¶¶ 53-54, resulting in the first of four revisions to his TOD Plan in months before his death. FSUF, ¶ 56. Fairly consistent with his operative will at the time, LeFeber designates the following beneficiaries: Shane, 45%; Faller, 25%,

Gibbons, 15%, and Davenport, 15%. In the weeks following June 25, 2010, LeFeber learns that his disease is terminal, FSUF, ¶ 61, executes an Advanced Directive naming Faller as his "Heath Care Representative," FSUF. ¶ 64, and meets with Huse to draft his new will. FSUF, ¶ 65.

Although the July 9, 2010 will represents a change in that Faller is devised Jim's house and pets, and neither the other Defendants nor the five others are named, Shane remains the primary beneficiary. SSUF, ex. 14. And LeFeber would soon provide for the other Defendants with revisions to his TOD Plan. Specifically, although they were no longer beneficiaries of LeFeber's will, the July 14, 2012 TOD Plan left 15% each to Gibbons and Davenport, as well as 55% to Shane and 15% to Faller. SSUF, ¶ 14. LeFeber made slight changes on July 22, 2010, by reducing Faller's share to 7.5%, presumably so that he could give Chabot 7.5%. SSUF, ¶ 58. LeFeber's final TOD Plan, dated August 10, 2010, made only small changes, with Davenport's share actually *increasing*: Shane, 56%; Gibbons, 16%; Davenport, 16%; Chabot, 8%; and Faller, 4%.

Although LeFeber made changes to his estate plans in the final years of his life, and especially in his final months, there are no discrepancies evidencing undue influence by Defendants. In fact, it is the October, 2007 will and TOD Plan that are out of place. When they are considered with LeFeber's contemporaneous

emails, it is clear that Davenport was the person trying to unduly influence James LeFeber.  It cannot be stressed enough that over the course of this alleged conspiracy against Davenport and LeFeber, Davenport's share of LeFeber's wealth increased nine times over, from the $50,000 she was given in the September, 2008 will to the almost $450,000 she would be entitled to under the August 10, 2010 TOD Plan.[13]

And although Davenport claims Shane unduly influenced LeFeber, his inheritance actually decreased over the period of this "conspiracy."   As of November 2006, Shane was entitled to all of the estate and all of the TOD Plan, but after the fraud, duress, and undue influence alleged by Davenport, he lost LeFeber's house and was only left 56% of the Scottrade account.  Similarly, although she was gifted LeFeber's house in his final will, Faller's share of the Scottrade account went from 25% in the June 2010 TOD Plan to 4% in the final TOD Plan.  Gibbons inheritance increased to 16% of the TOD Plan from the $250,000 he was gifted in LeFeber's 2008 will, FSUF Ex. 13, but they had known each other for decades, LeFeber considered Gibbons to be "one of his boys," and

---

[13]This amount represents 16% of the $2,809,313.63 that has been deposited in the Court registry. *Docs. 4 & 59.*  As discussed below, Davenport is no longer entitled to 16% of this amount because Davenport must pay attorney fees and costs for Scottrade, Faller, and Shane, since her frivolous claims caused this action to be filed and her bad faith amplified the proceedings.

Gibbons cared for Jim in his last days.

More importantly, Gibbons's inheritance did not increase as much as Davenport's. Excepting the voided holographic will and unexecuted TOD Plan from October 2007, Davenport's share increased from $50,000 in the September 2008 will to the nearly $450,000 she would have received if she had agreed to the TOD Plan. And again, Huse's affidavit and the exhibits thereto make clear that LeFeber seriously considered disinheriting Davenport, but he left her what he considered a "satisfactory amount" through the Scottrade TOD Plan in hopes she would not use her knowledge of the court system to cause problems with his estate. *Doc. 160,* ¶¶ 14-21. Unfortunately, a very generous gift and deliberate estate planning did not deter Davenport.

> **7. Whether the disposition of the property is such that a reasonable person would regard it as unnatural, unjust, or unfair, for example, whether the disposition abruptly and without apparent reason disinherited a faithful and deserving family member.**

The record is clear–LeFeber left his wealth to people who were closest to him and to Davenport, to whom he gave a satisfactory amount in hopes of deterring a lawsuit like this one. Nonetheless, Davenport finds great significance in the fact that Shane, Faller, and Gibbons are "not natural objects of LeFeber's bounty," not

relatives, and that Faller was not "romantically involved" with LeFeber. Davenport also cites the fact that LeFeber left nothing to Shane's two sisters, even though they were also Maggie Johnson's children. But not only is Davenport not related to LeFeber, there is no evidence their romantic relationship continued beyond 2007. And the record is clear that Jim LeFeber had disinherited his only daughter and considered Shane LeFeber his step son. His close relationship with Gibbons, who he also considered, "one of his boys." *See, e.g., doc. 68, p. 5,* is well-documented.

As to Faller, Davenport also cites emails indicating that Jim was frustrated that Faller was around too much in his last days. *Docs. 171-12, 171-13, 171-14.* That appears to be true, but their friendship over the years is well-documented. FSGI, ¶¶ 197-13. And significantly, Faller was the person LeFeber went to when he first learned he was sick. FSUF, ¶ 55. His irritation that Faller is around too much falls short of evidence of undue influence, especially since it is the only such "evidence."

Another good example of how far Davenport has to stretch to find anything which can remotely support her outrageous claims is her to citation to a September 8, 2010 hospice report indicating that Jim was upset with the hospice nurse for discussing his medications with Shane, Faller, and Chris. *Doc. 173-11.* But again, Davenport selectively cites this entry. The September 8 entry states that when the

nurse tried to talk to him about his medications, Jim "closed his eyes and walked away." It also states that Jim was mentally intact and emotionally strong about not losing control of his medications and "stubborn and resistant to all intervention other than the ones he has done pre-hospice." Since no one knew what medications and doses Jim was taking, the hospice nurse discussed medications with Shane, Faller, and Chris, and this "irritated" Jim. Viewed in context, Jim's irritation is not evidence that he chose his beneficiaries against his will.

### 8. Defendants did not prevent Davenport from seeing LeFeber

Davenport cites *Estate of Lightfield* for the proposition that close physical contact and a confidential relationship between the wrongdoer and the exclusion of the contestant is a material factor in considering whether there has been undue influence. 213 P.3d at 474. Although *Lightfield* did concern the maintenance of a confidential relationship between the testator and the beneficiary to the exclusion of the contestant, which would be relevant to undue influence, there is no evidence that LeFeber excluded Davenport–and certainly no evidence that Defendants excluded her. Gibbons avers that LeFeber repeatedly asked Davenport to come and meet Shane and Chris, but she would not do so. *Doc. 68,* Gibbons Declaration, pp 5-6. Gibbons expressly recalls that on the night before LeFeber died, LeFeber told Davenport that his hours were numbered and that she should come now if she

wanted to see him before he died, but she refused. *Id.* at p. 6.

Consistent with her ridiculous claim that Shane, Faller, and Gibbons murdered LeFeber to ensure they received his wealth before he changed his estate plan to give her everything (more on that below), Davenport cites an August 12, 2010 email from LeFeber to Shane as evidence that LeFeber threatened to remove Defendants from his estate plan. Davenport cites the portion of the email in which Jim says "I should just give my estate to the Poverello Center ... that way no one would have any bitch's [sic], as they can make it on their own anyway. Most everyone I know travels, has campers, motorhomes, and have their own homes." *Doc. 173-12.* Davenport argues that "most everyone" refers to Shane, Faller, and Gibbons. But a review of the whole email reveals Jim was complaining about Davenport. Earlier in the email chain, Jim told Shane that his day "has included a 2 ½ hr conversation listening to Kris Davenport tell me why she deserved my entire estate." Further, the phrase cited by Davenport above begins with "I told her," meaning Jim had told *Davenport* that he should just leave his estate to the Poverello Center.

### 9. Consideration of the five Montana Supreme Court factors also reveals there is no issue for trial

In considering whether there has been undue influence, Montana courts

consider the following non-exhaustive factors:

> (1) any confidential relationship between the person alleged to be exercising undue influence and the donor;

> (2) the physical condition of the donor as it may affect his or her ability to withstand influence;

> (3) the mental condition of the donor as it may affect his or her ability to withstand influence;

> (4) the unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to influence; and

> (5) the demands and importunities as they may affect the donor, taking into account the time, place and surrounding circumstances.

*Estate of Harmon*, 253 P.3d at 826.

First, for the purposes of summary judgment, the Court has assumed that James LeFeber had a confidential relationship with his step-son Shane, his friend Chris Gibbons, and his neighbor and attorney-in-fact Faller, all of who were LeFeber's caregivers in the last months of his life.

Second, although it is well-established that LeFeber's physical condition was rapidly deteriorating during the summer of 2010, there is no evidence that his physical condition made him susceptible to undue influence. As he was preparing his will he met personally with Huse on more than one occasion, FSGI, ¶¶ 41, 51, and faxed and emailed changes to Huse. FSGI, ¶¶ 47-48. In fact, Davenport

testified that Jim drove himself to her house in August 2010 and they had sex. FSUF, ¶ 135.

Third, the only evidence Davenport could muster that LeFeber's mental state rendered him susceptible to undue influence is that he was confused about his medication during hospice's first visit. *Doc. 173-4.* But as noted above, just a week before he died the hospice records reflect that James was mentally intact and emotionally strong enough to manage his own medications. *Doc. 173-11.*

Fourth, as discussed above, James LeFeber's will and TOD Plan leave his estate to the people he was closest with at the end of his life, as well as to Davenport, who he wanted to pay off in hopes that she would not cause problems for his other heirs.

Finally, the record is clear that the only demands and importunities placed on James LeFeber are attributable to Kristine Davenport.

There is no issue for trial. Judgment as a matter of law must be entered against Davenport on her undue influence claims.

### E.    BREACH OF FIDUCIARY DUTY

Davenport alleges Faller, Shane, and Gibbons breached their fiduciary duty to LeFeber by procuring a will and a TOD Plan that is favorable to them. *Doc. 28, p. 11; doc. 31, p. 11; doc. 41, p. 11.* Even assuming that Davenport can assert a

claim under such circumstances, it would involve the same facts as the undue influence claim. There is no issue for trial as to whether Defendants committed any wrongdoing with respect to LeFeber's will or TOD Plan. The undisputed evidence is that Davenport was the only person trying to influence or take advantage of LeFeber.

## F. DURESS

Under Montana law, duress requires confinement. Mont. Code Ann. § 28-2-402. The record reflects that Jim LeFeber traveled to Huse's office at least twice while the will was being drafted, went to the funeral home to make his own funeral engagements, and, if one can believe Davenport, drove to her house in Missoula in August 2010. Any claim that Defendants confined LeFeber against his will in order to influence his estate planning is patently frivolous. It appears that even Davenport recognizes this, as she does not address it in any of the numerous briefs she filed in support of or opposition to the summary judgment motions.

## G. FRAUD

Actual fraud requires proof of nine elements, but it can be summarized as knowingly making a material misrepresentation intended to deceive another who had a right to rely on the misreprentation, did rely on the misrepresentation, and was damaged by the misrepresentation. *Estate of Kindfather,* 108 P.2d 487, 490

(Mont. 2005).

In a show of uncharacteristic restraint, Davenport did not allege a fraud claim against Chabot. *Doc. 47.* With respect to the fraud claims against Shane, Faller, and Gibbons, the only arguments Davenport makes in her briefs is that she "genuinely disputes all material facts" related to the claim" and that she is "entitled to prove those acts through the testimony of Faller and other witnesses." *E.g., doc. 208, pp. 12-13.* Not so. Huse's declaration shows that James LeFeber carefully planned his estate in the last months of his life, and this planning is consistent with his prior estate plans. Davenport cannot stave off summary judgment by with unsupported denials or rank speculation. *McSherry,* 584 F.3d 1138.

Further, the fraud claim alleged in Davenport's pleadings allege Faller and the other Defendants made misrepresentations to LeFeber, which LeFeber relied on to his and Davenport's detriment. *Doc. 28, p. 10; doc. 31, pp. 7-8; doc. 41, pp 7-8.* Not only does Davenport lack standing to assert fraud claim on Jim LeFeber's behalf, the elements of fraud require the "*hearer's* consequent and proximate injury or damages caused by their reliance on the representation." *Estate of Kindsfather,* 108 P.3d at 490 (emphasis added).

Davenport's fraud claim is factually and legally baseless. Judgment as a matter of law must be entered against her on any claim of fraud.

## H. FELONIOUS KILLING AND SPOLIATION OF EVIDENCE

Davenport claims Defendants would be found guilty of murdering LeFeber under the preponderance of the evidence standard and they should therefore forfeit any rights they had to his wealth pursuant to Mont. Code Ann. § 72-2-813. Despite her outrageous claims to the contrary, the undisputed evidence is that James LeFeber died naturally of esophageal cancer and was lawfully cremated. His desire to be cremated was well-established and he went so far as to pre-arrange his own cremation, expressly designating Shane as the person who would sign the authorization. As with Davenport's other unfounded claims, the evidence is so one sided that it would make a mockery of justice to require Defendants to refute these allegations in a trial.

LeFeber learned he may have cancer in late June 2010, FSUF, ¶¶ 52-53. The cancer diagnosis was confirmed by Dr. Snyder, a board certified oncologist, on July 6, 2010. FSUF, ¶ 58-59. LeFeber then learned that "any prolongation in survival is likely to be measured in months, not years and that his overall survival untreated is probably less than a year." FSUF, ¶ 61. The next day he executed an "Advanced Directive" expressly dictating that if he was unable to communicate or make his own decisions, he should be given treatment to maintain his dignity and keep him comfortable, even if it shortened his life. FSUF, ex. 19. This is consistent with his

Living Will dated November 24, 1995, which provides that if there is no reasonable expectation he would recover from physical or mental disability, LeFeber should be allowed to die and "not be kept alive by medications, foods, artificial means or 'any heroic measures.'" FSUF, ex. 1.

On July 13, 2010, Dr. Snyder confirmed LeFeber's esophageal cancer was incurable. FSUF, ¶ 100. Dr. Snyder discussed chemotherapy, noting that it could only improve LeFeber's quality of life since its use to lengthen life under these circumstances was unproven. *Id.* After all of LeFeber's questions were answered, LeFeber opted for hospice care and Dr. Snyder made a hospice referral. *Id.* As part of the hospice referral, Dr. Snyder signed a "Certification of Terminal Illness Statement" on July 26, 2010, certifying that LeFeber was "terminally ill with a life expectancy of less than six months or less if the disease follows its normal course." *Doc. 159-5.* Later that day, LeFeber went to the funeral home and arranged for his cremation. FSUF, ¶¶ 111-114. The "Pre-Funeral Arrangement-Information" sheet from the funeral home indicated under the "next of kin" section that his "step son" Shane LeFeber would sign the authorization and that Chris Gibbons would pick up the ashes. FSUF, ¶ 27.

On August 26, 2010, at LeFeber's request, Dr. Snyder reviewed LeFeber's "Montana Provider Order for Life Sustaining Treatment" with him and signed off

on it. *Doc. 159-6.* Through this document, which expressly notes that it was completed at LeFeber's request, LeFeber made clear that he wanted to be allowed to die naturally and did not want any heroic life saving measures taken. *Id.* It further provided that although he wanted to be kept comfortable, he did not want to be kept alive with a feeding tube, and that he wanted to be transferred to a hospital only if his comfort needs could not be met at home. *Id.*

Hospice records from September 14, 2010 reveal that Jim was "declining rapidly [related to] disease progression." FSUF, ex. 29. When hospice visited at noon, Jim was still "totally resistant" to morphine, but he started asking for it at 4 p.m., and by 9 p.m. was "requesting comfort med intervention, accepting [the hospice nurse's] recommendations without resistance." *Id., pp. 1, 7.* He now had that "cancer look of greyness" and appeared to "have come to an acceptance of his terminal condition." *Id., p. 1.* The hospice nurse installed a morphine pain pump, but advised Jim and his caregivers (Faller and Gibbons) to remove it for any concerns or at Jim's request and continue with oral medication. *Id., p. 4.* The hospice nurse felt that Jim could die at any time. *Id., p. 7.*

At approximately 7:30 the next morning, hospice records indicate that Faller called to relate that Jim had pulled out the morphine pump about an hour after insertion because he thought it would increase his bleeding and render him unable

to mow the lawn.  FSUF, ex. 30.  Jim was up all night, irritable and anxious,

refusing all medical interventions.  *Id.*  The records also reveal that Faller was

honoring Jim's wishes and waiting for him to request medication, and that Faller

and Gibbons were "worn out."  *Id.*  Hospice encouraged the decision to honor Jim's

wishes and advised that Jim was likely suffering "terminal restlessness" and would

"die the way he lived."  *Id.*

By late morning, hospice had reinstalled the morphine pump with Jim's

agreement.  FSUF, ex. 31.  At 11:38 on September 15, 2010, Jim died peacefully in

the presence of a hospice nurse, Gibbons, and Faller.  FSUF, ex. 34, ¶¶ 141-144.

The Hospice Discharge Summary Report indicates Jim "expired @

home–symptoms controlled, died peacefully."  FSUF, ex. 32.  The Montana

Certificate of Death, signed by Dr. Snyder, identifies the "immediate cause of

death" as "esophageal cancer," and the "manner of death" as "natural," not

"homicide," "accident," "suicide," "pending investigation," or "could not be

determined."  FSUF, ¶¶145-47, *doc. 159-7.*  Dr. Snyder has averred that the "date

and manner of Mr. LeFeber=s [sic] death was consistent with my earlier diagnosis

and prognosis of esophageal cancer."  FSUF, ¶ 148.  Similarly, Faller's expert Dr.

Weiss, a board-certified in Hospice and Palliative Care Medicine and Medical

Director of the Billings Clinic Palliative Care Services, reviewed the medical

records and determined that death was attributable to the underlying disease.

FSUF, ¶ 150.

The day after LeFeber's death, hospice records reveal that LeFeber's leftover medications, including vials and tablets of Morphine, Haldol, and Lorazepam, vials of Versed, Tramadol tablets, and Codeine cough syrup, were wasted by mixing them with kitty litter, per hospice policy.  FSUF, ¶ 151.  Other drugs that were not destroyed were inventoried and stored at Huse Law Office, P.C., FSUF, ¶ 153.  Dr. Weiss avers that he found:

> no evidence in the hospice medical record that the symptom management drugs were delivered in any way inconsistent with the plan of care established with Mr. LeFeber, that they were not furnished in a safe manner by qualified hospice personnel, or that they were disposed of in a way inconsistent with usual hospice policy.

FSUF, ¶ 152.May 3, 2012

On September 16, 2010, mortician Dean Whitesitt authorized Jim LeFeber's body to be transported from his home, presumably to the Daly-Leach Crematorium. FSUF, ex. 39.  On that day, Shane also drove back to Montana.  SSUF, ¶ 103. The next day, September 17, 2010, Shane signed the cremation authorization and LeFeber's body was cremated, as authorized by the Deputy Coroner.  SSUF, ¶¶ 104, 106-07.

On September 18, 2010, Davenport called 911 and reported a "suspicious

circumstance" surrounding Jim's death and that he had been unlawfully cremated. SSUF, ¶ 108, 109. Davenport told the Ravalli County law enforcement that she believed LeFeber was murdered with an overdose of pain medication and that Defendants cremated him before a toxicology report could be done. FSUF, ¶¶ 108-09, ex. 36, p. 2. Deputy Maus of the Ravalli County Sheriff's Office contacted Dean Whitesitt of Whitesett Funeral Home by telephone and requested documents. *Id.,* ex. 36, p. 5. Maus reviewed the Pre Funeral Arrangement-Information Form and noted that it listed Shane, step son, and Gibbons, friend, as next of kin. *Id.*, p. 6. He then observed the Authorization for Cremation and Disposition Form and noted it was signed by Shane. *Id.* Finally, Maus reviewed the Death Certificate, which he noted was signed by Dr. Snyder, listed the manner of death as natural, the cause of death as esophageal cancer, and documented that the cremation was authorized by Lieutenant/Deputy Coroner Steve Holton. *Id.* After reviewing these documents, the case was closed for lack of evidence. *Id.*

Despite all of the evidence to the contrary, and Davenport's admissions that LeFeber's cancer was terminal, FSUF, ¶ 101, and that he wanted to be cremated, FSUF, ¶ 113, she maintains there is "circumstantial evidence" that Faller "could have given [Jim] an overdose of drugs," FSUF, ¶ 149, and that LeFeber was unlawfully cremated to cover up evidence of the murder. But just like her

arguments regarding undue influence, Davenport's purported circumstantial

evidence is only speculation based upon speculation.  *See doc. 198,* DSGI, pp. 6-

15.  Davenport's narrative Statement of Genuine Issues, supported by her affidavit

declaring everything to be true and supported by admissible evidence, relates her

theory of LeFeber's death and cremation:

- Jim did not invite Shane or Chris to his home, but that they showed up uninvited to ensure that Jim did not change his estate plans;

- Jim did not want hospice and wanted to go to the hospital if necessary, but gave into pressure from Defendants to use hospice;

- Defendants insisted Jim sign a "do not resuscitate" document so that after they killed him there would be no autopsy;

- Shane told Jim to tell people he was his son or step son and Gibbons falsely claimed Jim had saved his life and that he was staying with Jim out of gratitude in order to explain why non-relatives were "taking such an unusual interest in Jim and eliminate suspicion;"

- Jim complained to Davenport repeatedly that he was disgusted with Defendants for demanding any of his estate and told her that as soon as he got them out of his house he would revise his estate plan to give his estate to her and his daughter;

- Jim told Davenport he was afraid Defendants would kill him and that she should demand an autopsy because Defendants would not be able to get any of his estate if she could prove they killed him;

- Jim singed up for clinical trials and thought he might "beat the cancer" or live at least another year;

- Jim told Davenport on September 13, 2010 that he wanted to go to the

hospital, but that Faller and Gibbons would not let him go, telling him that even if an ambulance were called, they would not take him because of the paper he signed and also because Faller was his attorney-in-fact;

- Jim died in horrible, uncontrolled pain because he was afraid Defendants would kill him with a drug overdose, but finally he was unable to resist and they killed him with painkilling drugs;

- Shane drove back immediately to Montana after Jim died to sign the cremation authorization so that evidence of the murder would be destroyed; and

- Defendants did not call Davenport or LeFeber's daughter to tell them he had died so they would not investigate his death.

*Doc. 198.* Although Davenport spins a great yarn, without any evidence but her own speculations and legal conclusions, it is just that.

As evidence that Jim expected to live for a long time, Davenport cites a hospice report dated September 10, 2010, indicating he was only taking pain medication when necessary because it was very addicting. *Doc. 173-13.* This is a good example of how Davenport creates "evidence" by viewing a tidbit of information through the lens of her conspiracy. Similarly, as evidence that Jim threatened to disinherit Defendants and planned to revise his estate plan in favor of Davenport once Defendants left, she cites the email where Jim said he should give all his money to the Poverello Center in Missoula. *Doc. 173-12.* As discussed above, Jim probably said that because he had just listened to Davenport argue for 2

½ hours why she should get his entire estate.  *Id.*

The only legal argument Davenport makes regarding the alleged murder is that Defendants are estopped from claiming that she has no evidence that Defendants murdered LeFeber because Defendants spoliated evidence of the murder by illegally cremating LeFeber.  With regard to Davenport's cause of action for either negligent or intentional spoliation of evidence, it fails since it is not cognizable against parties to the litigation.  *Estate of Willson v. Addison*, 258 P.3d 410, 415 (Mont. 2011).  As a prime example of one of her arguments that have necessitated and complicated this matter, Davenport responds, without citation, that the *Willson* rule does not apply because Shane was not a party to this action when he spoliated the evidence.  Regardless, in adopting spoliation of evidence as a cause of action in Montana, the Montana Supreme Court noted there was no reason to adopt a new cause of action for litigants who have suffered a loss as a result of spoliation of evidence because discovery and other sanctions were already available to them–it was third parties who were lacking a remedy under existing law.  *Oliver v. Stimson Lumber Co.,* 993 P.2d 11, 17-18 (Mont. 1999), *citing Cedars-Sinai Medical Center v. Superior Court,* 954 P.2d 511, 517-18 (Cal. 1998); *see also Peschel v. City Of Missoula,* 664 F.Supp.2d 1137, 1142 (D.Mont. 2009)(district court has inherent power to levy sanctions for the spoliation of

68

evidence when a party knew, or reasonably should have known, that the spoliated evidence was potentially relevant to a claim).

Presented with case law invalidating her spoliation claims, Davenport argues in her response to Shane's motion for summary judgment that the Court should impose default judgment against him for unlawfully cremating LeFeber. Although, it is far too late to change course in a response to summary judgment, spoliation has been a primary focus of Davenport throughout this case and it is easily disposed of on its merits.

First, Jim LeFeber was not illegally cremated. Davenport clings to Mont. Code Ann. § 37-19-704(1), which provides that "[e]xcept as otherwise provided in this chapter, a crematory may not cremate human remains until it has received a cremation authorization." She then assumes, without a case cite or basis in the text, that the "cremation authorization" required by § 704(1) is the "affidavit or written instrument" mentioned in Mont. Code Ann. § 37-19-904(1). The latter section provides a "person who is 18 years of age or older and of sound mind wishing to authorize another person to control the disposition of the person's remains may execute an affidavit or a written instrument before a notary public in substantially the following form ..." Section 37-19-904(2) provides a hierarchy of persons entitled to control the remains of deceased persons that is applicable except for

situations involving "prepaid funeral arrangements" and disputes over the right to control disposition of deceased persons. Since LeFeber did not execute an affidavit conforming to § 37-19-904(1) and had no surviving spouse, Davenport argues that only LeFeber's (estranged) daughter was authorized to control the disposition of LeFeber's remains pursuant to § 37-19-904(2).

But § 37-19-704(1) is inapplicable to this situation. Section 704 is found in Part 7 of Chapter 19 of Title 39 and deals with "Licensing of Crematoriums, Crematory Operators, and Crematory Technicians." The purpose of that part is to "provide standards for the licensing and regulation of crematoriums" and "ensure the qualified and professional practice of crematory operation." Mont. Code Ann. § § 37-19-701. On the other hand, the "Right of Disposition of Remains" is governed by Part 9, of Chapter 19 of Title 39, whose purpose is to "provide an orderly and uniform system to determine which individuals hold the right to direct and carry out funeral and disposition arrangements for the remains of deceased individuals." Mont. Code Ann. § 37-19-902. In fact, Montana's First Judicial District Court has held that the "cremation authorization" mentioned in § 37-19-704 is one provided by the Montana Board of Funeral Services for a proposed location, it is a regulatory prerequisite to operating a crematory. *Amaro v. City of East Helena*, 2011 Mont. Dist. LEXIS 9 , ¶ 82 (Jan. 21, 2011). And even if it was

somehow relevant here, by its own terms § 704(1) is subject to exceptions otherwise provided in Chapter 19 of Title 39.

The exception of Chapter 19 of Title 39 that is relevant here is § 37-19-903, which provides that persons "18 years of age or older and of sound mind, by entering into a prepaid funeral contract with any mortuary ... may direct the location, manner, and conditions of disposition of the person's remains and the arrangements for funeral goods and services to be provided upon the person's death." It is undisputed that James LeFeber entered into a "prepaid funeral contract" directing the location, manner, and conditions of disposition of his remains upon his death. FSUF, exs. 11 &12; FSUF, ¶¶ 111-15. Under this prepaid funeral contract, Jim wanted to be cremated, wanted his step son Shane to sign the authorization, and wanted Gibbons to pick up the ashes. *Id.* And that is exactly what happened.

Second, even if Defendants had not cremated LeFeber, Davenport could not have obtained an autopsy. Autopsies are governed by Mont. Code Ann. § 50-21-103, and none of those provisions apply to Davenport. A body is unlike other pieces of evidence, civil litigants have no right to demand an autopsy. *Walsh v. Caidan,* 232 Cal.App. 3d 159, 162-63 (Cal. App. 1991); *Newman v. Sathyavaglswaran*, 287 F.3d 786, 794 (9th Cir. 2002). The coroner, however, has

discretion to order an autopsy.  Mont. Code Ann. § 46-4-103(1).  Since Jim

LeFeber died of esophageal cancer, Deputy Coroner Steve Holton authorized the

cremation rather than an unnecessary autopsy.  SSGI, ¶ 46.

There are no genuine issues of material fact and judgment as a matter of law

must be entered against Davenport on her claims that Defendants feloniously killed

James LeFeber and spoliated evidence of that felonious killing by illegally

cremating his body.

## I.    ACTIVE PERSUASION, ENCOURAGEMENT AND INCITING, AND UNCONSCIONABLE CONDUCT

Since these causes of action do not exist under Montana law, and the Court

has considered the same underlying conduct in granting judgment as a matter of

law in favor of Defendants on Davenport's undue influence, duress, and fraud

claims, Defendants are also entitled to judgment as a matter of law on Davenport's

nebulous claims of "active persuasion," "encouragement and inciting," and

"unconscionable conduct."

## J.    CIVIL CONSPIRACY

There being no valid underlying tort, Davenport's civil conspiracy claims

fails as a matter of law.  *Duffy v. Butte Teachers' Union,* 541 P.2d 1199, 1202

(Mont. 1975).

### K.    UNCLEAN HANDS

Davenport argues summary judgment should be entered against Gibbons on all his claims against her because he comes before the Court with unclean hands. *Docs. 178 & 179.* Specifically, Davenport claims Gibbons lied to the Court when he represented to the Court that he overheard Jim's conversation with Davenport on the evening of September 14, 2010, the evening before Jim died, during which Jim told Davenport that his days were numbered and that if she wanted to see him, she should come soon. *Doc. 68, p. 6.* As evidence of Gibbons's alleged misrepresentation, Davenport offers what she purports to be phone records showing that she did not speak with LeFeber on September 14, 2010. *Doc. 179-10.* Davenport further alleges Gibbons lied when he averred that Davenport refused to come visit LeFeber in the last weeks of his life. As evidence of this, she cites emails from Jim to Shane in which Jim notes that Davenport wanted to come visit him in July, 2010. *Doc. 179-1.*

Regardless, even if it were proven that Gibbons made deliberate misrepresentations, Davenport is ineligible to benefit from the doctrine of unclean hands. *Cowan v. Cowan,* 89 P.3d 6, 9 (Mont. 2004) (doctrine of unclean hands doctrine provides that parties must not expect relief in equity, unless they come into court with clean hands).

## L. ATTORNEY FEES

One of Davenport's six motions for summary judgment argues that she should not be liable for the attorney's fees of Scottrade or Defendants. *Doc. 182.* Although Davenport filed a brief in support, the only law cited in that brief is a cursory citation to Rule 56, Fed.R.Civ.P. Davenport claims she is not responsible for Scottrade's attorney fees and costs because prior to the filing of this action, she performed on her part of a "binding contract" with Scottrade through which she relieved Scottrade from liability for releasing the funds to Defendants, thus obviating the need to incur attorney fees for this lawsuit. Davenport argues she is not liable for Defendants' attorney fees because Defendants and Scottrade necessitated this lawsuit by requiring her to release any claims she may have against Defendants before the account was distributed. Again, Davenport's only evidentiary support for her motion is another narrative affidavit. *Docs. 184 & 185.*

First, Davenport's alleged "binding contract" with Scottrade is just like her alleged oral contract with LeFeber–nonexistent. Davenport's assertion that Scottrade's attorney "accepted Kristine's offer on behalf of Scottrade and thus Scottrade and Kristine entered into a binding legal contract" does not establish a contract, or even create a genuine issue of material fact that such a contract existed. *Docs. 184, ¶ 4; 185, ¶ 4.* Second, the record makes clear that Davenport has no

factual basis for any of her claims and she alone bears responsibility for this lawsuit and for the attorney fees incurred by all parties. Faced with litigation, Scottrade wisely required a release of all claims before releasing any funds. When Davenport refused to do so, Scottrade prudently filed this action.

After spending considerable time with this case over the last fifteen months the Court is convinced that the only equitable solution is to tax all attorney fees against Davenport's share of the Scottrade account. Before addressing the legal justifications for this decision, the Court notes that Davenport's claims and arguments have been rejected at every stage of this action and she has repeatedly been warned that her claims appeared to be totally frivolous and unless she was able to provide admissible evidence of her conspiracy, costs of the litigation would be paid from her share. Davenport's conduct is even more egregious when one considers she is trained as an attorney and has been sanctioned for frivolous and vindictive litigation in the past. *See doc. 90.*

In April of 2011, this Court dismissed Scottrade from this action and ordered that the roughly $6,000 in attorneys fees and costs it incurred in the action be paid from the proceeds of LeFeber's Scottrade account held in the Court registry. *Doc. 42.* In the same Order, the Court found that Scottrade had acted prudently by filing the action and that Davenport's claims against Scottrade were baseless. *Id.* Ruling

was reserved as to whether Scottrade's fees should be paid from the share of one or more Defendants. *Id.* That was the first hint.

The second hint came in two Orders dated June 2, 2011, where the Court reiterated that Scottrade had acted prudently by filing this matter and that since there was a significant sum of money at stake in this action, Davenport should retain counsel. *Docs. 71 & 72.*

At the July 20, 2011 preliminary pretrial conference held by telephone, it became obvious that Davenport had absolutely nothing but her own conclusions to support her claims. The Court was informed that Davenport had yet to provide opposing parties with any way to investigate her claims, since her preliminary pretrial statement and initial disclosures merely referred back to the conclusory allegations in her pleadings. The Court then issued the third hint, via an Order directing Davenport to provide this information within twenty days. *Doc. 93.* Davenport was further advised of the requirements of Rule 11(b) Fed.R.Civ.P., that this Court would not hesitate to enforce Rule 11(b) with appropriate sanctions, and that Davenport should reconsider whether her allegations have evidentiary support and withdraw any baseless claims. *Id.* Despite further warning of the consequences for making false accusations, Davenport has yet to withdraw any claims or provide the required information. *Doc. 106.*

Finally, on October 14, 2011, Davenport's third-party claims against Arnold Faller, Patty's husband, were dismissed with prejudice because they were mere legal conclusions unsupported by factual allegations. *Doc. 114.* Moreover, since Davenport's claims against Arnold Faller were vexatious, it was ordered that Arnold Faller's attorney's fees and costs be paid from Davenport's share of the funds held in the Court registry.

In ordering that Davenport pay Arnold Faller's attorney's fees and costs, the Court relied on United States Supreme Court precedent holding that federal courts have inherent power to assess attorney's fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45-46 (1991). The Montana Supreme Court has also recognized an exception to the general rule that attorney fees are not recoverable, the exception is applicable where "a party has been forced to defend against a wholly frivolous or malicious action." *National Cas. Co. v. American Bankers Ins. Co. of Florida,* 19 P.3d 223, 227 (Mont. 2001). Except for some *pro se* prisoner cases that were dismissed outright pursuant to 28 U.S.C. §§ 1915A(a), this Court has never seen such frivolous claims as those alleged by Davenport in this case. These allegations have prevented the distribution of James LeFeber's estate and deprived Defendants of their inheritance for almost 18 months now. It is only fair that the attorney fees

and costs of Faller, Shane, and Scottrade be paid from Davenport's share.[14]

Second, the Montana Supreme Court has expressly held that Montana Code § 27-8-313 authorizes the awarding of attorney's fees in declaratory judgment actions "when the court, in its discretion, deems such an award necessary or proper." *Trustees of Indiana University v. Buxbaum,* 69 P.3d 663, 673 (Mont. 2003) (internal quotations omitted). Although to the best of its knowledge, this Court has only applied this rule in insurance coverage actions, *see Nielsen v. TIG Ins. Co.,* 442 F.Supp.2d 972 (D.Mont. 2006) and *Robb v. State Farm Mut. Auto. Ins. Co.,* 2006 WL 3354135 (D.Mont. 2006), the Court was clear that it "need not limit application of the above rationale to the typical insurance arrangement." *Buxbaum,* 69 P.3d at 673. The record in this case establishes that an award of attorney fees to Faller and Shane is necessary and proper.

Third, although the Court could not find any authority authorizing payment of attorney fees to successful interpleader claimants from the losing claimant's share, it is well-established that courts have discretion to pay the interpleader

---

[14]Although it seems unfair, it is well-established in other areas of the law that *pro se* litigants are not entitled to attorney fee awards. *See Kay v. Ehrler,* 499 U.S. 432 (1991) (denying fees under § 1988); *Benavides v. Bureau of Prisons,* 993 F.2d 257 (D.C. Cir. 1993) (denying fees under the FOIA)*; Crooker v. EPA,* 763 F.2d 16 (1st Cir. 1985) (per curiam) (denying fees under the EAJA)*; Cazalas v. U.S. Dept. of Justice,* 709 F.2d 1051 (5th Cir. 1983) (denying fees under the FOIA). Accordingly, Gibbons and Chabot are not entitled to claim fees for the time expended defending Davenport's frivolous claims.

plaintiff's attorney's fees from the fund payable to the winning claimants, against the losing claimant, or between all of the claimants. *Chase Inv. Services Corp. v. Law Offices of Jon Divens & Associates, LLC*, 748 F.Supp.2d 1145, 1183 (C.D.Cal. 2010) *citing Schirmer Stevedoring Co., Ltd. v. Seaboard Stevedoring Corp.,* 306 F.2d 188, 195 (9th Cir.1962). The usual practice is to tax the fees against the losing claimant because the losing claiming necessitated the interpleader and prevents the winning claimant(s) from obtaining the fund undiminished by the costs. *Id., citing* Wright, Miller & Kane, *Federal Practice & Procedure,* vol. 7 § 1719 (3d ed. 2010); *see also Metropolitan Life Ins. Co. v. Jordan*, 221 F.Supp. 842, 843 (W.D.N.C. 1963) (if the court awards attorney fees to interpleader plaintiff, they "ought to be ultimately paid by the party whose claim has been adjudged groundless and whose assertion of the claim necessitated the interpleader."). Here, in the absence of Davenport's groundless claims Jim LeFeber's Scottrade account would long ago have been distributed, without litigation, pursuant to his TOD Plan.

Finally, although the Court is not imposing sanctions under these Rules because there are other provisions in the law to ensure that Shane and Faller's inheritance are not depleted by this unnecessary lawsuit, it must be noted that Davenport has violated both Rule 11(b) and Rule 56(f) Fed.R.Civ.P. She could be assessed attorney's fees as sanctions under both of these rules.

## IV. ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** as follows:

(1) Shane LeFeber, Patricia Faller, Christopher Gibbons, and Kimberly Chabot are entitled to summary judgment in their favor on all of Davenport's claims against them, including undue influence, fraud, civil conspiracy, duress, felonious killing, spoliation of evidence, tortious interference with contract and expectancy, breach of fiduciary duty, unclean hands, active persuasion, encouragement and inciting, unconscionable conduct, and any other cause of action Davenport has alleged in any of her filings;

(2) All of Davenport's motions for summary judgment (*docs. 170, 172, 174, 176, 178, & 182*) are **DENIED**;

(2) Shane LeFeber's motion for summary judgment (*doc. 162*), Patricia Faller's motion for summary judgment (*doc. 166*), and Christopher Gibbons and Kimberly Chabot's motion for summary judgment (*doc. 190*) are **GRANTED**;

(3) All other pending motions (*docs. 186, 188, 195, 217, 221, 224, 226, 228, 230, 232, 234, 236, 238, 240, 242, & 244*) are **DENIED AS MOOT**;

(4) Declaratory judgment shall be entered in favor of Shane LeFeber, Patricia Faller, Christopher Gibbons, and Kimberly Chabot, and against Davenport as follows:

    (a) James LeFeber's August 10, 2010 TOD Plan and the allocation of the Scottrade funds pursuant to the beneficiary designations therein are valid, binding, and enforceable;

    (b) There is no contract with respect to the Scottrade funds that supercedes or takes precedence over the TOD Plan; and

    (c) Faller, Shane, Gibbons, and Chabot are entitled to their

respective portion of the Scottrade funds pursuant to the TOD Plan, undiminished by any fees or costs;

(5)     In addition to the $11,189.10 in attorney's fees and costs awarded to Arnold Faller (*docs. 114 & 124*), the $6,142.53 in fees awarded to Scottrade (*doc. 42*), and the attorney's fees and costs incurred by Patty Faller and Shane LeFeber for this lawsuit shall be deducted from Davenport's percentage of the Scottrade funds.  Within fourteen days of the entry of this Order, counsel for Patricia Faller and Shane LeFeber shall submit bills detailing all reasonable attorney fees and costs incurred by their clients in this matter.  The Court will then review the bills for reasonableness and enter an Order specifying the amounts to be deducted from Davenport's share of the Scottrade funds;

(6)     Once the Court determines the amount of attorney fees and costs for Patricia Faller and Shane LeFeber, the Court will determine whether Shane LeFeber, Patricia Faller, Christopher Gibbons, and Kimberly Chabot are entitled to pre-judgment interest and a final judgment will be entered; and

(7)     In the interests of caution, the Court intends to keep the Scottrade funds in the Court registry until the Court of Appeals has ruled on any appeals taken from the judgment of this Court.  Since any appeal by Davenport would also be frivolous and taken in bad faith, the Court intends to tax attorney fees on appeal to Davenport's share of the Scottrade funds.

Dated this 5th day of June, 2012.

                                        */s/ Richard F. Cebull*_____
                                        Richard F. Cebull
                                        United States District Judge